TENNESSEE COAL, IRON & RAILROAD CO. ET AL.
*v.* MUSCODA LOCAL No. 123 ET AL.

No. 409. Argued January 13, 14, 1944.—Decided March 27, 1944.

*Messrs. Nathan L. Miller* and *Borden Burr* for the Tennessee Coal, Iron & Railroad Co., petitioner. *Messrs. E. L. All, S. M. Bronaugh,* and *William B. White* submitted for the Sloss-Sheffield Steel & Iron Co., and *Messrs. T. F. Patton, R. T. Rivers,* and *Borden Burr* for the Republic Steel Corp., petitioners.

*Mr. Crampton Harris,* with whom *Messrs. J. Q. Smith* and *Lee Pressman* were on the brief (*Mr. James A. Lipscomb* entered an appearance), for respondents.

*Solicitor General Fahy,* with whom *Messrs. Robert L. Stern, Douglas B. Maggs, Irving J. Levy,* and *Miss Bessie Margolin* were on the brief, for the Administrator of the Wage and Hour Division, U. S. Department of Labor, intervener.

Mr. Justice Murphy delivered the opinion of the Court.

We are confronted here with the problem of determining in part what constitutes work or employment in under-

ground iron ore mines within the meaning of the Fair Labor Standards Act, 52 Stat. 1060, 29 U. S. C. § 201. This question, which is one of first impression, arises out of conflicting claims based upon the actual activities pursued and upon prior custom and contract in the iron ore mines. Such an issue can be resolved only by discarding formalities and adopting a realistic attitude, recognizing that we are dealing with human beings and with a statute that is intended to secure to them the fruits of their toil and exertion.

Three iron ore mining companies, petitioners herein, filed declaratory judgment actions [1] to determine whether time spent by iron ore miners in traveling underground in mines to and from the "working face" [2] constitutes work or employment for which compensation must be paid under the Act. The respondent labor unions and their officials, representing petitioners' employees, were named as defendants and the Administrator of the Wage and Hour Division of the Department of Labor was allowed to intervene. The actual controversy relates only to the hours of employment during the period intervening between the effective date of the Act, October 24, 1938, and the dates when the respective actions were initiated in April, 1941.[3]  It is

---

[1] These actions were instituted under the Federal Declaratory Judgments Act, 48 Stat. 955, § 274D, 28 U. S. C. § 400. They were consolidated for trial purposes and the District Court entered a single judgment.

[2] The "working face" is the place in the mine where the miners actually drill and load ore. The "face to face" basis of compensation, advocated by petitioners, includes only the time spent at the working face. The "portal to portal" basis, proposed by respondents, includes time spent in traveling between the portal or entrance to the mine and the working face and back again, as well as the time spent at the working face.

[3] Since May 5, 1941, petitioners have paid their miners for travel time pursuant to contract in compliance with the opinion of the Administrator of the Wage and Hour Division that underground travel in iron ore mines is work within the meaning of the Act.

conceded that if underground travel constitutes employment, the miners worked more than the statutory maximum workweek and are entitled to be paid one and one-half times the regular rate for the excess hours. But if the travel time is excluded from the workweek, thus limiting it to the time spent at the working face, no overtime payments are due.

After extended hearings, the District Court found that the travel time "bears in a substantial degree every indicia of worktime: supervision by the employer, physical and mental exertion, activity necessary to be performed for the employers' benefit, and conditions peculiar to the occupation of mining." The court accordingly ruled that the travel time, as well as the time spent at the surface obtaining and returning tools, lamps and carbide and checking in and out, was included within the workweek. 40 F. Supp. 4. The Circuit Court of Appeals affirmed as to the travel time, holding that the District Court's findings on that matter were supported by substantial evidence. The judgment was modified by the Circuit Court, however, by excluding from the workweek the time spent in the activities at the surface. 135 F. 2d 320; rehearing denied, 137 F. 2d 176. The importance of the problem as to the travel time led us to grant certiorari.[4]

Specifically we are called upon to decide whether the District Court and the Circuit Court of Appeals properly found that iron ore miners were at work within the meaning of the Act while engaged in underground travel which they were obliged to perform on the property of and under the direction of petitioners as a necessary concomitant of their employment. The record shows that petitioners own and operate twelve underground iron ore

---

[4] No review has been sought of the exclusion from the workweek of the activities at the surface. We therefore do not discuss that issue in this case. *Alexander* v. *Cosden Pipe Line Co.*, 290 U. S. 484, 487, and cases cited.

mines in Jefferson County, Alabama,[5] and that the general pattern of facts underlying the findings of the courts below is essentially the same in each of these mines.[6]

The miners begin their day by arriving on the company property at a scheduled hour [7] and going to the bath house, where they change into working clothes.[8] They then walk to the tally house near the mine entrance or portal; there they check in and hang up individual brass checks, furnished by petitioners, on a tally or check-in board. This enables the foreman and other officials to tell at a glance those individuals who have reported for work and those production and service crews that are incomplete and in need of substitutes. Vacancies are filled and the head miners and crews receive any necessary instructions. In addition, each miner either rents a battery lamp for the day or buys a can of carbide each day or two for underground illumination purposes. And at some of the mines,

---

[5] The Tennessee Coal, Iron & Railroad Company has eight mines; Sloss-Sheffield Steel & Iron Company, two mines; and Republic Steel Corporation, two mines.

[6] As the District Court pointed out, the conditions set forth by the record are not intended to be used to censure petitioners' manner of maintenance of their mines, "for these conditions may well be normal conditions in iron ore mines and practically inevitable." Moreover, the record indicates that the Spaulding mine of the Republic Company has been operated only intermittently and experimentally during the last 20 years and many of the conditions in the other mines are not present. The ore is close to the surface and miners can walk all the way to the working faces.

[7] One of the Tennessee Company's superintendents stated that "Whenever a man comes to the mine late, dragging along and encourages others to be late, he is setting a bad example. I want this understood thoroughly—men must be on time; we don't care whether they work here or not, but if they want to work here they will have to be on time or else they will be disciplined, even to discharge."

[8] The use of the bath house, or change house, is optional. Some miners change their clothes at home and make no use of the bath houses furnished by petitioners.

many miners stop at a tool box or tool house on the surface to pick up other small supplies and tools necessary for their work. These activities consume but a few minutes.

The miners thereupon are required to report at the loading platform at the mine portal and await their turn to ride down the inclined shafts of the mines. Originally the miners could reach the working faces entirely by foot, but as the shafts increased in length petitioners provided transportation down the main shafts. The miners accordingly ride part of the way to the working faces in ore skips [9] or regular man trips,[10] which operate on narrow gauge tracks by means of cables or hoisting ropes. The operation of the skips and man trips is under the strict control and supervision of the petitioners at all times and they refuse to permit the miners to walk rather than ride. Regular schedules are fixed; loading and unloading are supervised; the speed of the trips is regulated; and the conduct of the miners during the rides is prescribed.

About three to six trips are made, depending on the size of the mine and the number of miners. Ten men sit on each man trip car, while from 30 to 40 are crowded into an ore skip. They are forced to jump several feet into the skip from the loading platform, which not infrequently causes injuries to ankles, feet and hands. The skips are usually overcrowded and the men stand tightly pressed together. The heads of most of them are a foot or more

[9] An ore skip is an ordinary four-wheeled ore box car made of steel. It is normally used for transporting ore and its floor is often covered with muck from such haulings. When men are riding in the car it is known as a "man skip trip." It is used for such purposes in the mines of the Tennessee Company and the Republic Company.

[10] A regular man trip is a specially constructed series of cars. Each car is about eight feet long and resembles a stairway. Five men sit on either side of the car facing outwards, back to back with five men on the other side. The man trip used in the Sloss Company mines consists of six such cars.

above the top of the skips. But since the skips usually clear the low mine ceilings by only a few inches, the miners are compelled to bend over. They thus ride in a close "spoon-fashion," with bodies contorted and heads drawn below the level of the skip top. Broken ribs, injured arms and legs, and bloody heads often result; even fatalities are not unknown.

The length of the rides in the dark, moist, malodorous shafts varies in the different mines from 3,000 feet to 12,000 feet. The miners then climb out of the skips and man trips at the underground man-loading platforms or "hoodlums" and continue their journeys on foot for distances up to two miles. These subterranean walks are filled with discomforts and hidden perils. The surroundings are dark and dank. The air is increasingly warm and humid, the ventilation poor. Odors of human sewage, resulting from a complete absence of sanitary facilities, permeate the atmosphere. Rotting mine timbers add to the befouling of the air. Many of the passages are level, but others take the form of tunnels and steep grades. Water, muck and stray pieces of ore often make the footing uncertain. Low ceilings must be ducked and moving ore skips must be avoided. Overhead, a maze of water and air pipe lines, telephone wires, and exposed high voltage electric cables and wires present ever-dangerous obstacles, especially to those transporting tools. At all times the miners are subject to the hazards of falling rocks.

Moreover, most of the working equipment, except drills and heavy supplies, is kept near the "hoodlums." This equipment is carried each day by foot by the crews through these perilous paths from the "hoodlums" to the working faces. Included are such items as fifty-pound sacks of dynamite, dynamite caps, fuses, gallon cans of oil and servicemen's supplies. Actual drilling and loading of the ore begin on arrival at the working faces, interrupted only by a thirty minute lunch period spent at or near the faces.

The service and maintenance men, of course, work where-ever they are needed.

At the end of the day's duties at the working faces, the miners lay down their drills, pick up their other equipment and retrace their steps back to the "hoodlums." They wait there until an ore skip or man trip is available to transport them back to the portal. After arriving on the surface, they return their small tools and lamps, pick up their brass checks at the tally house, and proceed to bathe and change their clothes at the bath house. Finally they leave petitioners' property and return to their homes.

In determining whether this underground travel con-stitutes compensable work or employment within the meaning of the Fair Labor Standards Act, we are not guided by any precise statutory definition of work or em-ployment. Section 7 (a) merely provides that no one, who is engaged in commerce or in the production of goods for commerce, shall be employed for a workweek longer than the prescribed hours unless compensation is paid for the excess hours at a rate not less than one and one-half times the regular rate. Section 3 (g) defines the word "employ" to include "to suffer or permit to work," while § 3 (j) states that "production" includes "any process or occupation necessary to . . . production."

But these provisions, like the other portions of the Fair Labor Standards Act, are remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner. Accordingly we view §§ 7 (a), 3 (g) and 3 (j) of the Act as necessarily indicative of a Congressional intention to guarantee either regular or overtime compensation for all actual work or employ-

ment.  To hold that an employer may validly compensate his employees for only a fraction of the time consumed in actual labor would be inconsistent with the very purpose and structure of those sections of the Act.  It is vital, of course, to determine first the extent of the actual work-week.  Only after this is done can the minimum wage and maximum hour requirements of the Act be effectively applied.  And, in the absence of a contrary legislative expression, we cannot assume that Congress here was referring to work or employment other than as those words are commonly used—as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.[11]

Viewing the facts of this case as found by both courts below in the light of the foregoing considerations, we are unwilling to conclude that the underground travel in petitioners' iron ore mines cannot be construed as work or employment within the meaning of the Act.  The exacting and dangerous conditions in the mine shafts stand as mute, unanswerable proof that the journey from and to the portal involves continuous physical and mental exertion as well as hazards to life and limb.  And this compulsory travel occurs entirely on petitioners' property and is at all times under their strict control and supervision.

---

[11] Webster's New International Dictionary (2d ed., unabridged) defines work as follows: "1. To exert oneself physically or mentally for a purpose, esp., in common speech, to exert oneself thus in doing something undertaken chiefly for gain, for improvement in one's material, intellectual, or physical condition, or under compulsion of any kind, as distinguished from something undertaken primarily for pleasure, sport, or immediate gratification, or as merely incidental to other activities (as a disagreeable walk involved in going to see a friend, or the packing of a trunk for a pleasure trip) . . ."  The word "employ" is defined as follows: "2. To make use of the services of; to give employment to; to entrust with some duty or behest."

Such travel, furthermore, is not primarily undertaken for the convenience of the miners and bears no relation whatever to their needs or to the distance between their homes and the mines.[12] Rather the travel time is spent for the benefit of petitioners and their iron ore mining operations. The extraction of ore from these mines by its very nature necessitates dangerous travel in petitioners' underground shafts in order to reach the working faces, where production actually occurs. Such hazardous travel is thus essential to petitioners' production. It matters not that such travel is, in a strict sense, a non-productive benefit. Nothing in the statute or in reason demands that every moment of an employee's time devoted to the service of his employer shall be directly productive. Section 3 (j) of the Act expressly provides that it is sufficient if an employee is engaged in a process or occupation necessary to production. Hence employees engaged in such necessary but not directly productive activities as watching and guarding a building,[13] waiting for work,[14] and standing by on call[15] have been held to be engaged in work necessary to production and entitled to the benefits of the Act. Iron ore miners traveling underground are no less engaged in a "process or occupation" necessary to actual production. They do more than "stand and wait," *Missouri, K. & T. Ry. Co.* v. *United States,* 231 U. S. 112, 119. Cf. *Bountiful Brick Co.* v. *Giles,* 276 U. S. 154, 158. Theirs is a fossorial activity bearing all the indicia of hard labor.

---

[12] Cf. *Dollar* v. *Caddo River Lumber Co.,* 43 F. Supp. 822; *Sirmon* v. *Cron & Gracey Drilling Corp.,* 44 F. Supp. 29; *Bulot* v. *Freeport Sulphur Co.,* 45 F. Supp. 380; *Walling* v. *Peavy-Wilson Lumber Co.,* 49 F. Supp. 846.

[13] *Walton* v. *Southern Package Corp.,* 320 U. S. 540; *Kirschbaum Co.* v. *Walling,* 316 U. S. 517.

[14] *Fleming* v. *North Georgia Mfg. Co.,* 33 F. Supp. 1005; *Travis* v. *Ray,* 41 F. Supp. 6.

[15] *Walling* v. *Allied Messenger Service,* 47 F. Supp. 773.

The conclusion that underground travel in iron ore mines is work has also been reached by the Administrator of the Wage and Hour Division. On March 17, 1941, he approved an informal report of his representative based upon an investigation of the "hours worked" in underground metal mines in the United States. The report concluded, in part, that "The workday in underground metal mining starts when the miner reports for duty as required at or near the collar [portal] of the mine and ends when he reaches the collar at the end of the shift." See also *Sunshine Mining Co.* v. *Carver*, 41 F. Supp. 60. In addition, statutes of several important metal mining states provide that the eight-hour per day limitation upon work includes travel underground.[16]

Petitioners, however, rely mainly upon the alleged "immemorial custom and agreements arrived at by the practice of collective bargaining" which are said to establish "the 'face to face' method as the standard and measure

---

[16] Arizona and Utah statutes specifically include all the travel time within the eight-hour limitation. Ariz. Code Ann. (1939), vol. 4, § 56–115; Utah Code Ann. (1943), § 49–3–2. The Supreme Court of Montana has construed Mont. Const., art. 18, § 4, and Mont. Rev. Code (1935), § 3071, which provide for eight hours of work per day in underground mines, to include all travel time, *Butte Miners' Union No. 1* v. *Anaconda Copper Mining Co.,* 112 Mont. 418, 118 P. 2d 148. Nevada Comp. Laws (1929), § 10237, provides that the limitation shall apply to travel one way. But Wyoming Rev. Stat. (1931), § 63–107, specifically excludes underground travel from the limitation; a like result has been reached by interpretation of California Stats. 1909, ch. 181, p. 279, in *Matter of Application of Martin,* 157 Cal. 59, 106 P. 238. Alabama and Tennessee fix no limitation on hours, while maximum hour statutes of other metal mining states are inconclusive insofar as the inclusion of travel time is concerned. See also § 5 (2) of the English Metalliferous Mines Regulation Act (1872), 35 & 36 Vict., c. 77, which provides that "The period of each employment shall be deemed to begin at the time of leaving the surface, and to end at the time of returning to the surface."

for computing working time in the iron ore industry." They further claim that since the Fair Labor Standards Act contains no specific provision regarding underground travel in mines, Congress must be presumed to have intended to perpetuate existing customs or to leave the matter to be worked out through the process of collective bargaining.

The short answer is that the District Court was unable to find from the evidence that any such "immemorial" custom or collective bargaining agreements existed. That court, in making its findings, properly directed its attention solely to the evidence concerning petitioners' iron ore mines and disregarded the customs and contracts in the coal mining industry. There was ample evidence that prior to the crucial date of the enactment of the statute, the provisions in petitioners' contracts with their employees relating to a forty hour workweek "at the usual working place" bore no relation to the amount of time actually worked or the compensation received. Instead, working time and payment appear to have been related to the amount of iron ore mined each day. Hence such contract provisions defining the workweek are of little if any value in determining the workweek and compensation under a statute which requires that they be directly related to the actual work performed.

Likewise there was substantial, if not conclusive, evidence that prior to 1938 petitioners recognized no independent labor unions and engaged in no bona fide collective bargaining with an eye toward reaching agreements on the workweek. Contracts with company-dominated unions and discriminatory actions toward the independent unions are poor substitutes for "contracts fairly arrived at through the process of collective bargaining." The wage payments and work on a tonnage basis, as well as the contract provisions as to the workweek, were all dictated by petitioners. The futile efforts by the miners

to secure at least partial compensation for their travel time and their dissatisfaction with existing arrangements, moreover, negative the conclusion that there was any real custom as to the workweek and compensation therefor. A valid custom cannot be based on so turbulent and discordant a history; it requires something more than unilateral and arbitrary imposition of working conditions.[17] We thus cannot say that the District Court's findings as to custom and contract are so clearly erroneous as to compel us to disregard them.

But in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the workweek or not to compensate employees for certain portions of their work. The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act.[18] Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory

---

[17] Blackstone has said that one of the requisites of a valid custom is that "it must have been peaceable, and acquiesced in; not subject to contention and dispute. For as customs owe their original to common consent, their being immemorially disputed, either at law or otherwise, is a proof that such consent was wanting." 1 Commentaries 77. See also Pollock, First Book of Jurisprudence, 283 (6th ed.).

[18] Congress was not unaware of the effect that collective bargaining contracts might have on overtime pay. It expressly decided to give effect to two kinds of collective agreements, as specified in § 7 (b) (1) and (2) of the Act. Cf. § 8 (c). It thus did not intend that other collective agreements should relieve employers from paying for overtime in excess of an actual workweek of 40 hours, regardless of the provisions of such contracts.

rights. Cf. *Overnight Motor Co.* v. *Missel,* 316 U. S. 572; *Holden* v. *Hardy,* 169 U. S. 366. See also *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467; *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332; *Order of Railroad Telegraphers* v. *Railway Express Agency,* 321 U. S. 342.

This does not foreclose, of course, reasonable provisions of contract or custom governing the computation of work hours where precisely accurate computation is difficult or impossible. Nor are we concerned here with the effect that custom and contract may have in borderline cases where the other facts give rise to serious doubts as to whether certain activity or non-activity constitutes work or employment. It is sufficient in this case that the facts relating to underground travel in iron ore mines leave no uncertainty as to its character as work. The Act thus requires that appropriate compensation be paid for such work. Any other conclusion would deprive the iron ore miners of the just remuneration guaranteed them by the Act for contributing their time, liberty and strength primarily for the benefit of others.

The judgment of the court below is accordingly

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring:

The legal question on the record before us lies within a narrow compass. Section 7 of the Fair Labor Standards Act commands the payment of compensation at a rate of not less than one and one-half times the regular rate for every employee under the statute who is engaged "for a workweek" longer than forty-four or forty-two hours during the first or the second year, respectively, after the effective date of the section and forty hours thereafter. 52 Stat. 1060, 1063, 29 U. S. C. § 207. Congress did not explicitly define "workweek" and there is nothing in the available materials pertinent to construction that warrants a finding that "workweek," as applied to the workers in the iron ore industry, had so settled a

meaning at the time of the enactment of the Fair Labor Standards Act as to be deemed incorporated by reference. As a result, "workweek" in this statute, as applied to workers in this industry and on this record, has no technical meaning, that is, a meaning so well known to those in this particular industry as to be applied by courts in enforcing the statute when invoked by men in the industry. For purposes of this case, in any event, when Congress used the word "workweek," it used it colloquially— the term carries merely the meaning of common understanding.

An administrative agency for preliminary adjudication of issues arising under the Wages and Hours Law, like that established by the National Labor Relations Act, was not provided by Congress. And so, the application of this colloquial concept "workweek" to the multifarious situations in American industry was left by Congress for ascertainment by judicial proceedings. These facts are to be found either by a jury or, as in this case, by a judge sitting without a jury. And so here it was the judge's duty to determine what time and energy on the part of the employees involved in this suit constituted a "workweek" of these employees of the petitioners. After a trial which lasted for about three weeks, during which testimony covering 2,643 pages was heard and voluminous exhibits were introduced, the District Court made its findings of fact. A judgment for the employees based on these findings was affirmed by the Circuit Court of Appeals. 40 F. Supp. 4; 135 F. 2d 320.

We have then a judgment of two courts based on findings with ample evidence to warrant such findings. Affirmance by this Court is therefore demanded.

MR. JUSTICE JACKSON, concurring:

This case in my view probably does not present any question of law or, if so, it is one with a very obvious

answer. When Congress in the Fair Labor Standards Act referred to "a workweek longer than forty hours," it considered, I assume, that what was a workweek in fact should be a workweek in law. Therefore, the determination of any particular case does not govern any other, for each establishment and industry stands on its own conditions.

A seasoned and wise rule of this Court makes concurrent findings of two courts below final here in the absence of very exceptional showing of error. *Goodyear Tire & Rubber Co.* v. *Ray-O-Vac Co.*, 321 U. S. 275; *District of Columbia* v. *Pace*, 320 U. S. 698; *Baker* v. *Schofield*, 243 U. S. 114, 118; *Williams Manufacturing Co.* v. *United Shoe Machinery Corp.*, 316 U. S. 364, 367.

In these cases ore mining companies sought declaratory judgments that miners' travel time in the shafts getting to and from actual mining operations, and some other time, is not to be counted in the workweek as defined for overtime purposes in the Fair Labor Standards Act. They alleged that the custom of their mines excluded it, but the trial court considered all the evidence and said, "The evidence has disclosed no such custom." The companies also contended that the activity during travel is not in the nature of work. After hearing a mass of conflicting testimony the trial court said of these activities, "They are performed on the premises of the employer, in the furtherance of the employer's business, with no benefit to the employee (except to aid him in the performance of work for the employer), under conditions created and controlled by the employer, and they involve responsibility to the employer and physical exertion, even though not burdensome, on the part of the employee. No characteristic of work is lacking." These were found to be the facts by the two courts below and, whatever we might decide if we were a trial court hearing the evidence in the first instance, we cannot with our limited review hold them wrong on this record.

If these facts are accepted, the ruling that such travel time is part of the workweek seems manifest. I would affirm on these controlling facts.

Mr. Justice Roberts:

The question for decision in this case should be approached not on the basis of any broad humanitarian prepossessions we may all entertain, not with a desire to construe legislation so as to accomplish what we deem worthy objects, but in the traditional and, if we are to have a government of laws, the essential attitude of ascertaining what Congress has enacted rather than what we wish it had enacted.

Much of what is said in the opinion, in my view, disregards this fundamental function of the judicial process and relies on considerations which have no place in the solution of the issue presented.

What did Congress mean when it said, in § 7 (a) of the Fair Labor Standards Act, that "No employer shall . . . employ any of his employees . . . *for a workweek* longer than forty hours . . . unless such employee receives compensation" for overtime at a specified rate? No other issue is presented.

The materials for decision are those to which resort always has been had in ascertaining the meaning of a statute. They are the mischief to be remedied, the purpose of Congress in the light of the mischief, and the means adopted to promote that purpose. These are not obscure in this instance.

The committe reports upon the bill which became the Fair Labor Standards Act[1] make it clear that the sole purpose was to increase employment, to require a fair day's pay for a fair day's work by raising the wages of the

---

[1] H. R. 1452, 75th Cong., 1st Sess., H. R. 2182, 75th Cong., 3d Sess., S. R. 884, 75th Cong., 1st Sess.

most poorly paid workers and reducing the hours of those most overworked, and thus correct inequalities in the cost of producing goods and prevent unfair competition in commerce. The reports disclose no other purpose. The Congressional findings and declaration of policy embodied in § 2 (a)[2] exhibit no intent to deal with any matter other than substandard conditions in industry stemming from wage and hour practices. The Act will be searched in vain for a mandate respecting any subject other than minimum wages and maximum hours of work. This court has construed it as dealing only with these subjects.[3]

In this setting, therefore, we are to determine what Congress meant by the term "workweek" when it prescribed the maximum number of hours of labor an employer might require to be rendered within any week at the standard wage. The Act does not define "workweek," for the evident reason that Congress believed it had a conventional meaning which all would understand and to which all could conform their practices. The term combines two words in common use. A week is any period of seven days. In accepted usage a man's work means that which he does for his employer as the consideration of the wage he receives. The term is often used in a more general sense as when one is asked what he is doing and replies "I am working for Jones." Of course he does not mean that Jones is paying him for each hour of every week of his life. Men are not commonly paid for the time they sleep, the time they eat, or the time they take to go to, and return from, their employer's premises. Thus, although the phrase "work" may refer to the calling pursued, or the identity of the employer, it is plainly not so used in this statute. Its collocation with the word "week" and with the injunction as to minimum pay, maximum

---

[2] 52 Stat. 1060.

[3] *United States* v. *Darby,* 312 U. S. 100, 115, 117, 122, 125.

hours, and overtime for extra work, in any week, shows that what Congress meant by work was what I have above described,—the actual service rendered to the employer for which he pays wages in conformity to custom or agreement.

It is common knowledge that what constitutes work for which payment is to be made varies with customs and practices in different industries or businesses. Where the employe is required to report at his employer's place of business and go thence to the place where his employer's activities are pursued, it has been the custom in some cases to pay for the time spent in going from the employer's place of business to the place of work. In many industries some or all of the employes are required to report and to remain at a given place awaiting a call for emergency or other casual service and, according to understanding, they are paid for the hours during which they wait as well as those in which they actually put forth physical or mental effort. There can be little doubt that Congress expected the provisions of the Act to be fitted into the prevailing practices and understandings as to what constituted work in various industries.

The Act does not provide that the Administrator or the courts are to define a workweek in the case of each employer on such basis as they deem right, regardless of the custom of the industry or of existing agreements between employers and employes. Nor does the Act vest authority in Administrator or court to disregard and supersede existing understandings and practices as to what constitutes work or the workweek. There is nothing in the words of the statute or its history to suggest that Congress intended, without mentioning it, to confer on the Administrator or the courts so vast a power over the industry of the nation.

The question in this case then is: What was the workweek of iron miners when the Act was adopted? If the

answer is plain, then, I submit, that existing workweek must control in the administration of the statute unless and until employer and employes, by consensual arrangement, alter the current practice.

The record presents no dispute as to the facts. Some are matters of public notoriety susceptible of judicial notice; others are contained in offers of evidence which the District Court excluded as irrelevant; others are exposed in the proofs.

Conditions of labor in iron mines and in coal mines are similar. In both, as the workings become deeper, the men have farther to go to reach the places at which they labor. The time thus consumed by individual workmen varies in the same mine, and in different mines. The conditions in the channels of approach to the places of work are somewhat better in iron mines than in coal mines. The custom in coal mines is, therefore, persuasive, since some of the petitioners maintain coal and iron mines in close proximity, and since the practice in the two has been the same for many years.

In the public arbitration proceedings at Birmingham, Alabama, in 1903, the testimony showed that a miner's day was reckoned "from the time [he] gets to the face of the coal until he leaves the face of the coal," and that the eight hour day was so measured. That arbitration resulted in a wage agreement on the "face to face" basis; that is, on a wage fixed according to the time the miners worked at the face of the coal.

In 1917 a public board of arbitration, whose award was approved by the United States Fuel Administrator, found:

"An eight hour day means eight hours work at the usual working places of all classes of employees. This shall be exclusive of the time required in reaching such working places in the morning and departing from the same at night."

In 1920 the report and award of the Bituminous Coal Commission, which was made the basis of agreement between operators and union miners, employed the language just quoted.

In 1933 the Code of Fair Competition for the Bituminous Coal Industry, promulgated by the President under the National Industrial Recovery Act, provided:

"Seven hours of labor shall constitute a day's work and this means seven hours work at the usual working places for all classes of labor, exclusive of the lunch period, whether they be paid on the day or the tonnage or other piecework basis."

In 1933 the Appalachian Agreement, approved by the President, provided:

"Eight hours of labor shall constitute a day's work. The eight-hour day means eight hours' work in the mines at the usual working places for all classes of labor, exclusive of the lunch period."

Prior to 1938, the petitioner Tennessee Coal, Iron & Railroad Company paid its miners either on a piecework basis or upon a shift basis, as did the petitioners Sloss-Sheffield and Republic Steel. But the common understanding of men and management was that, at first, ten hours and, later, eight hours constituted a working day. This is shown by the proofs and there is no evidence to the contrary.

On numerous occasions the men working in these mines claimed, through their unions, that they ought to be paid for travel time consumed in the mines in going to or from the face where they worked. Their demands for pay for travel time are eloquent proof that they understood the basis on which their pay was reckoned and that it did not include travel time as working time. No agreement to pay for travel time was made and no practice to pay for it was adopted.

In 1934 Tennessee made an agreement with the Union representing its employees, which was renewed in 1935,

and again in 1936. It is undisputed that all of these agreements excluded payment for travel time. On October 6, 1938, before the Fair Labor Standards Act was in effect, a collective bargaining agreement was made between the International Union, affiliated with the CIO, and the Tennessee Company. In this agreement it was provided:

"Section 4—Hours of Work. Eight (8) hours shall constitute a day's work and forty (40) hours shall constitute a week's work. Time and one-half shall be paid for all overtime in excess of eight (8) hours in any one day or for all overtime in excess of forty (40) hours in any one week.

"The eight (8) hour day means eight hours of work in or about the mines at the usual working places for all classes of labor, exclusive of the lunch period, whether they be paid by the day or be paid on the tonnage basis."

This agreement remained in effect until May 5, 1941, when the provisions in question were abrogated pursuant to an opinion promulgated by the Wage and Hour Administrator as hereinafter described.

The circumstances are not materially different with respect to Sloss-Sheffield. That company has bargained with a union representing its miners since 1934. Several times the union made a demand for payment of travel time but this was not granted. A formal agreement containing the same definitions of workweek, and hours of work, as in the case of Tennessee, was executed in 1939 and renewed in 1940. The company continued to pay on the face to face basis until 1941.

Republic Steel has had no formal written agreement with its employes, but it has bargained with their union. As early as 1933 the union suggested that an arrangement be made whereby the men enter the mine on their own time and come out on company time, but the matter was not pressed. It came up again in 1934. After a strike, negotiations resulted in a return of the men to

work on the face to face plan of payment. In 1935 the union proposed that the employes should enter on their own time and come out on company time, but in negotiations the matter was dropped. In 1936 the union wrote the company respecting an agreement and, in its proposal, said: "The eight hour day means eight hours in or about the mines, at the usual working places for all classes of work." In 1939 the union proposed an agreement containing a like provision. In that year the union preferred charges before the National Labor Relations Board but these did not involve the face to face basis of wage computation. The complaint was settled by stipulation. The company continued to pay for a day's work on the face to face basis until May 1, 1941.

The Fair Labor Standards Act became effective October 24, 1938. At that time coal and iron miners were being paid on the basis of their time spent at their working places in the mine. The miners fully understood this basis.

On July 9, 1940, the director of the legal department of the United Mine Workers of America, in a letter to the Administrator of the Act, requested that he accept the definition of working time contained in the Appalachian agreement, which the letter said embodied "the custom and traditions of the bituminous mining industry." That definition was the same as that quoted from the Tennessee agreement, supra. The letter further said, respecting the face to face method:

"This method of measuring the working time at the places of work has been the standard provision in the basic wage agreements for almost fifty years and is the result of collective bargaining in its complete sense."
and further said:

"As mines grow older, the working places move farther and farther away from the portal or opening of the mine, and as such conditions develop, it becomes necessary for

provision to be made for transportation of the men over long distances to their working places."

and added that adjustment of wage rates to any new measurement

"would create so much confusion in the bituminous industry as to result in complete chaos, and would probably result in a complete stoppage of work at practically all of the coal mines in the United States."

On the footing of that letter the Administrator issued a release stating that the face to face basis in the bituminous industry would not be unreasonable.

On March 23, 1941, the Administrator announced a modified portal to portal wage hour opinion in which he defined the workday in underground metal mining as starting when the miner reports at the collar of the mine, ends when he returns to the collar, and includes the time spent on the surface in obtaining and returning lamps, carbide, and tools and in checking in and out. Realizing that this was a complete change of opinion, the Administrator announced that he would not seek to compel payment of restitution from mine owners operating on a face to face basis but that he could not interfere with the right of employes or their representatives to sue for past overtime and penalties under § 16 (b) of the Act. Thereupon the unions representing miners demanded payment of overtime for all travel time since the effective date of the Act, and invoked the penalties specified therein.

In order to avoid possible penalties, the petitioners complied with the Administrator's ruling and brought the present suit for a declaratory judgment to the effect that working time of underground employes comprised the hours of work in the usual working places in the mine and did not include the time consumed in travel thereto and therefrom.

At the trial much evidence was taken as to the practice existing in iron mines long prior to, and at the date

of the adoption of, the Fair Labor Standards Act. This was given by miners, foremen, and employers, and represented not any single locality but the industry over the country. In fact, some of the testimony consisted of depositions taken by the respondents, but offered by the petitioners. It was all to the effect that the working time of iron miners had always been calculated and paid for according to the time worked in the mine at the place assigned for the work and that travel time had never been included in the time for which payment was made.

The district judge entered twenty-nine findings of fact. The first four are formal. The fifth is to the effect that, in the history of mining in the Birmingham District, plaintiffs' employes have been paid without regard to the number of hours spent at the face of the ore or at any specified place or station in the mines, and adds: "This compensation has never been based upon any precise number of hours spent daily at the face of the seam or at any specified place or station in the mines." The finding would seem difficult to explain in view of the history heretofore outlined. The explanation is found in the fact that, although the men were paid for an eight hour day of work at the face, if blasts were about to be set off at the close of the day the men were sent away from the face some time before the blasting but were, nevertheless, paid as if they had remained at the face for the full eight hours. But this can be no reason for disregarding the practices and agreements of the parties.

Findings 6 to 12, inclusive, refer to various methods of payment practiced in the past and to the character of the work of miners and other underground workers. They evidently are intended to show that, while an eight hour day was in force, the wage was not calculated at an hourly rate. Of course, they do not contradict the fact that forty hours constituted the workweek nor the fact that it was

understood that no wages were paid for time spent in travel in the mines.

Finding 13 is to the effect that the unions which made agreements with various petitioners had never been certified by the National Labor Relations Board as appropriate units for collective bargaining. The bearing of this finding is difficult to understand in view of the fact that the employers dealt with the unions representing their men and two operated under formal collective bargaining agreements with nationally affiliated unions.

Finding 14 briefly mentions that the men had several times demanded pay for travel time.

Findings 15 to 27, inclusive, describe the conditions under which the men arrive at the mine, check in, obtain their tools, and walk, or are carried, to their work underground and how they return. They recite that the men have to obey company regulations while they are on the company property and in going to and returning from work. Many of these regulations are for the men's safety. These findings also show that, after arriving on company property, the men receive certain directions with respect to the work they are to do. The obvious bearing of these findings is that the court thought travel ought to be considered work, within the intendment of the Act, whatever the custom, practice, or agreement of the parties. It would be no less a judicial fiat, though somewhat more extreme, to hold that as the men's living quarters are uncomfortable and unhealthy and they must live in the neighborhood of the mines, the time spent in their homes must be paid for as work.

The two concluding findings are of facts which add nothing. They are to the effect that, if all the travel time is counted in the workweek, the men have worked more than forty hours per week and the petitioners have not paid them for more than forty hours.

The opinion and concurring opinion in this court rely heavily on these findings, especially as they were accepted by the Circuit Court of Appeals. But it will be observed that the findings are noteworthy for the feature that they deal, except in the instance mentioned, which has already been explained, with facts which are immaterial to the issues in the case. I do not see how aid to decision can be derived by refusing to disturb findings which do not meet the issue made by the pleadings. It is significant that the District Court avoided any finding as to whether the employers had ever paid travel time or as to the understanding of the parties that the employers were not paying for such travel time. And it is even more significant that the court made no finding whatever about the formal collective bargaining agreements entered into by the respondents with the petitioners in which both parties clearly signified their understanding of what was work in iron mines. And the court could not, under the proofs in this case, have found that these collective bargaining agreements were contrary to the accepted practice in iron and coal mines throughout the country prior to 1941. The petitioners objected that the findings omitted any reference to the fact that the companies had never paid for travel time, to the fact that the day's work for which wages were paid did not include travel time to or from the place where they mined the ore, or to the negotiations and agreements as to working time, and sought a new trial. The objections and motions were overruled.

Reliance is placed on the trial court's finding that the evidence discloses no custom to exclude travel time from the workweek. But that very reliance exposes the fallacy of the lower court's and this court's position. Unless the statute gave the courts authority to make contracts for the parties, which the statute did not make, a court could not support such a contract by finding that there was no custom with respect to travel time. It would be necessary for

it to find that there was a custom to pay for such time, which the District Court failed to do, for the obvious reason that there was no evidence of such custom.

To say that we should pitch decision on acceptance of the findings of the trial court, when that court neglected to find facts which were highly relevant and material, is to disregard the real and the only issue in the case.

As I have already pointed out, the Fair Labor Standards Act was not intended by Congress to turn into work that which was not work, or not so understood to be, at the time of its passage. It was not intended to permit courts to designate as work some activity of an employe, which neither employer nor employe had ever regarded as work, merely because the court thought that such activity imposed such hardship on him or involved conditions so deleterious to his health or welfare that he ought to be compensated for them.

It is common knowledge that the issue of portal to portal pay was first nationally raised in connection with the mining industry after the nation was at war and in connection with disastrous coal strikes. And, indeed, the inspiration for the demand for portal to portal pay was furnished by the decision of the court below in this case. That decision was rendered on March 16, 1943. Three days later the National Policy Committee of the United Mine Workers changed its demanded definition of hours of labor so that existing demands, which, until then, had been on the traditional face to face basis of payment, should "conform with the basic legal requirements of the industry and the maximum hours of work time provisions be amended to establish 'portal to portal' for starting and quitting time for all underground workers." In presenting this demand it said: "The Mine Workers desire to take advantage of the law which, under the Alabama decision, grants them the right to be paid for the time they are in the mines." Thus it is plain that the decision under review was understood,

as it must be, as a declaration of law by a court as to what is a workweek under the Act and not a finding of fact based on the custom of the industry and the agreement of the parties. In August class actions were filed by the United Mine Workers in various district courts to obtain overtime compensation for portal to portal pay.

One further fact should be noted. The District Court found that not only the travel time from and to the mouth of the mine should be counted as working time, but that the time men spent on the surface in collecting tools, etc. should also be included. The Circuit Court of Appeals, although professing to accept the fact findings of the District Court, reversed its judgment with respect to time spent on the surface, saying no more than that the District Court was wrong in including that time. This is further proof that the decision of the case by both courts below turns on the view of a court as to what ought to be considered work and what not, irrespective of the understanding of the parties. Suppose that the parties had agreed that travel time was working time and to be included and paid for in the workweek? Would the courts be at liberty to find the contrary and deprive respondents of the benefit of the agreement? I think not.

I cannot better characterize the result in this case than by quoting from what Judge Sibley said in his dissenting opinion below: [4]

"If it would be better to include travel time in work time, it ought to be done by a new bargain in which rates of pay are also reviewed. If the change is to be by a special statute (some western States have such statutes), it will operate justly in futuro, and not by unexpected penalty, as here.

"There is nothing in the Act to outlaw agreements that travel time in getting to or from the agreed place of work

---

[4] 135 F. 2d 324, 325.

is not work time. This is true though the employer may organize a means of transportation and make rules for its use. The agreements here that work time includes only time at the face of the ore bed are not illegal. Digging out the ore is what the miners agree to do, and for that they are paid. Getting their tools together and riding or walking to the agreed place of work is not, by force of any law, work done for the mine owner. No one, I suppose, would say that if a group of miners who had spent an hour riding to work decided of their own will not to dig any ore and spent another hour riding back, they had done any work for which they should be paid by force of the Act.

.          .          .          .          .

"It is now proposed to assess against these appellants as back pay for overtime an estimated quarter of a million dollars, to be doubled by way of penalty, to compensate the miners for their time in going to and from their place of work, in the face of their agreements that this time was not in their work time. They are to get three times as much per hour for riding and walking to and from the work they were hired to do, as they get for doing the work itself. The injustice of it to me is shocking."

I would reverse the judgment.

The CHIEF JUSTICE joins in this opinion.