**WALLING, Adm'r, Wage and Hour Div. U. S. Department of Labor, v. ANACONDA COPPER MINING CO.**

No. 271.

District Court, D. Montana, Missoula Division.

Aug. 24, 1946.

William S. Tyson, Acting Sol., and Jeter S. Ray, Asst. Sol., both of Washington, D. C., James M. Miller, Regional Atty., and Winston C. Johnson, Atty., both of Minneapolis, Minn., and C. Ira Funston, Supervising Atty., Dept. of Labor, of Washington, D. C., for plaintiff.

W. H. Hoover, R. H. Glover, John V. Dwyer, J. T. Finlen, Jr., and Sam Stephenson, Jr., all of Butte, Mont., W. L. Murphy, of Missoula, Mont., and C. A. Hart, of Portland, Ore., for defendant.

BROWN, District Judge.

Plaintiff brings the action, seeking judgment permanently enjoining the defendant from a violation of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. He alleges in his complaint that the defendant corporation is engaged, in part, in the business of logging at Woodworth, Montana, and employs as many as 129 employees at a given time, in its logging operations; that since May 22, 1945, defendant has repeatedly violated and continues to violate the act by employing its employees for work weeks longer than 40 hours, without compensating the employees at rates not less than 1½ times the regular rates. The alleged violation consists in the failure of the defendant to include in determining the number of hours worked the excess of 40 hours per week in traveling over the defendant's railroad and logging roads from its logging camp to the sites of active logging operations. Answer was filed, the case came to issue and was tried before the Court. No evidence was presented on the part of the defendant. The facts disclose that for some years past the defendant has carried on a logging business; that at the time in question the defendant was operating from two camps, one known as Headquarters camp and one known as Camp No. 8. Practically all of the evidence was pointed to the activities centered around Camp No. 8. This camp was opened in February, 1944, apparently operated for a short time and then operations from that camp were discontinued until February, 1945, and have been carried on since that time. The camp is located on the edge of the timber and operations first took place there and from there penetrated deeper into the forest. The camp is located a number of miles from any town or city and in locating the camp the defendant constructed a cook house, a meat house, filing house, repair shop, garage, bathroom and wash house, a building for grinding axes and sharpening saws, a recreation hall and in addition supplied bunk cars and an office car. Facilities were supplied by the defendant for the employees to board and sleep at this camp. There was nothing in the contract of hiring which required any employee to avail himself of those facilities or to live at the camp, and neither were any express orders to such effect given by defendant. The employees who did so paid defendant for their board at a price fixed by the defendant, satisfactory to the employees. Most of the employees resided at the camp during the work week from Monday through Friday. A few, owning automobiles, lived in Ovando and Woodworth, small towns some distance from Camp No. 8, and drove to Camp No. 8 each morning and back to their homes in the evening. Some other employees, whose families resided in Missoula, a city some miles distant from Camp No. 8, and owning automobiles, drove their automobiles from the camp at the end of the week's work on Friday evening and returned to the camp from their homes Sunday evening, preparatory to commencing the work week starting Monday morning. When operations were first commenced from the camp the employees walked from the camp to their respective places in the woods at which they were working. As operations penetrated deeper in the woods and further from the camp the defendant, at its expense, furnished transportation for the employees from the camp to the various working places in the woods. The transportation consisted of what is commonly referred to as the "goose", this being a car powered by a Ford V-8 motor, with benches in the car for the men to sit on, the car being capable of being operated from either end and pulling a car or other cars, equipped with benches, for the men to ride on, the cars being standard gauge and operated over the defendant's logging railroad. The foreman of the men accompany them during the ride.

At other times the men are transported from the camp to the respective working places in the woods by trucks with boards laid across the body to form seats for the men to ride on during the journey. From Camp No. 8 there are woods roads and logging roads leading to the various places at which the men work. The time consumed in the ride from the camp to the working places is between 10 and 15 minutes each way. The routine in the camp during the work week is as follows: at approximately 6:00 o'clock in the morning a bell rings and the men turn out for breakfast. The foreman usually goes through the bunkhouse. After breakfast the men board the goose or the trucks, depending upon which system of transportation is used on the particular day, about 7:00 a.m., in time to permit the goose or trucks to leave the camp so as to place the men at their working places in the woods at 7:30 o'clock in the morning when productive work commences. This journey from the camp requires 10 or 15 minutes to accomplish. The men then work from 7:30 in the morning until 4:30 in the afternoon, with an hour off for lunch. The goose or trucks leave the working place at 4:30. The men are then transported back to camp, the time consumed being between 10 and 15 minutes. The men are paid for the 8 hours work done between 7:30 in the morning and 4:30 in the afternoon and receive no compensation for the time spent in riding from the camp to their place of work or from their place of work back to the camp. The men, including those who do not live at the camp, but drive back and forth, report at the camp in the morning before the goose leaves. The foreman looks the men over at the camp before the goose departs. If some of the men are absent, the foreman, before departure of the goose or trucks, makes such rearrangement of the duties of the men for the particular day as he deems advisable because of the absence of one or more of the workers. Where men work in pairs, such as sawyers, and one of the pair is absent, he assigns another man to work with the sawyer for the day, or assigns the one sawyer to different work for the day and

gives such orders as in his opinion are needed. The men are paid at the camp. It is not made an express condition of the employment that any of the men avail themselves of the transportation furnished by the defendant in getting from the camp to their working places in the woods, and none of the men are expressly ordered by the defendant so to do. The evidence discloses that customarily all of the men use the transportation furnished in going to their work from the camp, irrespective of whether they are the owners of automobiles or not, although on rare and infrequent occasions some of those owning automobiles have been known to drive their automobile directly to the place of their work in the woods. Whether such was done because at some particular time such individual arrived at the camp after the departure of the goose or trucks, or for some other reason, is not disclosed by the evidence. If, because of rain, in the opinion of the foreman, work cannot be carried on in the woods, the men driving their automobiles customarily report to Camp 8 and are there informed that they are not to work in the woods, but are given a half-day's work around the camp. Men driving back and forth between Camp 8 and Ovando and Woodworth in the summer time may receive the information that there is no work for the day because of weather conditions by telephoning from the headquarters camp to Camp 8. They cannot, however, so telephone in the winter time. While changes in work sites are made due to the nature of the operations, usually they are made only after intervals of some months and not frequently. It is conceded that the defendant and its employees were engaged in the production of goods for interstate commerce.

In addition to the activities recited at Camp 8, it appears that the defendant had facilities for section men to live if they so desired at the headquarters camp. Their duties were to construct and keep in repair and operating condition the defendant's logging railroad, right-of-way and bridges. Their work day likewise commenced at 7:30 in the morning and ceased at 4:30 in the afternoon with an hour off

for lunch. If they were to start the day's work at headquarters camp, they did not start until 7:30 in the morning when their day's pay commenced. If, however, they were to start the day's work on some part of the track away from headquarters camp, as directed by the foreman, they would leave the headquarters camp and ride on a speeder furnished by defendant over the railroad to the point where they were to commence their day's work. They would leave headquarters camp sufficiently in advance of 7:30 in the morning to be at their place of work at 7:30 and would not leave their place of work until 4:30 when they would board the speeder and ride to headquarters camp. The time consumed each way usually did not exceed 15 minutes and the section men were not paid for any such riding time, but paid only for the 8 hours between 7:30 and 4:30 that they were actually engaged in productive work. At most of the places the section hands worked there was no other means of access to the working place except over the railroad of the defendant and no roads led to the working places.

The case made necessitates construction of Section 207, 29 U.S.C.A., which provides, where material here, as follows: "(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—* * * (3) for a workweek longer than 40 hours * * * unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The sole question presented to the Court for determination is whether or not the actual time consumed in the men riding from camp to their place of work in the morning and riding from their place of work to Camp 8 in the afternoon is to be included within the work week under the statute and constitutes work for which they are entitled to compensation. There is nothing about the transportation itself or the actual riding which is either burdensome, onerous, hazardous or uncomfortable to the employees.

The authority controlling the decision here is that of the Supreme Court as announced in Tennessee Coal, Iron and Railroad Company et al. v. Muscoda Local No. 123 et al., 321 U.S. 590, 64 S.Ct. 698, 88 L. Ed. 949, 152 A.L.R. 1014, Jewell Ridge Coal Corporation v. Local No. 6167, 325 U.S. 161, 897, 65 S.Ct. 1063, 1550, 89 L.Ed. 1534, 2007, and Anderson et al. v. Mt. Clemens Pottery Company, 326 U.S. 706, 66 S.Ct. 91. In the Tennessee Coal Company case, [321 U.S. 590, 64 S.Ct. 700] the Supreme Court defines the words "work or employment", as used in the act, as meaning "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." The Supreme Court further held in the same case that an employee could be at work even though his service at the particular moment was not directly productive.

■ Whether or not the employees were at work when riding is therefore a question of fact to be determined from all of the evidence in the record in light of the guidance furnished by the Supreme Court in the cases cited.

Employees at Camp 8.

■ From the evidence it appears that the business conducted by defendant was such as required the employment of men to successfully carry it on. Due to its nature and character it was carried on, of necessity, far from any city or town where the necessities of life such as food and lodging were available to the men employed by the defendant and without which they could not work. In view of this fact, known to the defendant, it then of necessity supplied those facilities at its Camp 8 and upon its own property, and other buildings for its own use as an administrative center for the work being carried on by it and for it by the men employed. The camp was established as a point from which its logging operations commenced and as a center from which to direct it. From the fact that the business being carried on was that of the defendant, conducted primarily for its own benefit and not for the benefit of the employees, the inference logically follows that

any particular thing done or activity taken by the defendant, in connection with the business, was done primarily for its benefit and not that of the employees and the particular activity questioned must be viewed in light of the inference. When logging operations commenced no transportation was provided by the defendant as the working places were within walking distance of the camp. As the men penetrated deeper into the woods, transportation was provided by defendant at its cost and expense and used for the purpose of transporting the men from the camp to their working places. This was a determination by the employer that transportation was needed in the efficient and economical conduct of its business. There is no evidence in the record that the transportation was furnished by the defendant at any request or suggestion of the employees or upon consultation with them or by reason of any expression on their part that such transportation would serve the comfort and convenience and benefit of the employees. The type of conveyance to be used as transportation was determined by the company. The place and time of the conveyance leaving was determined by the company. It was used by the employees only in going to and returning from their work and for no other purpose. Defendant contends that as the facts are that the employees were not compelled to ride the goose or trucks, were not ordered to do so, and no compulsion was exercised in that regard, the employees had a choice of means of getting from the camp to the working places and it necessarily follows that the transportation was furnished for their comfort and convenience and not primarily for the interests of the defendant. The record does not support the contention that the greater portion of the employees had such choice. Webster's New International Dictionary defines "choice" as "A sufficient number and variety to choose among", and again as "Act of choosing; the voluntary act of selecting or separating from two or more things that which is preferred; the determination of the mind in preferring one thing to another". It is thus apparent that there must be more than one thing before an individual has a choice. As applied to transportation, before it can be said the individual has a choice, there must be more than one method or system of transportation available. If there is only one then the employee does not have a choice as to methods of transportation. His choice then is either using the method provided or staying where he is. The employees did not even have the right to choose between transportation by the goose and transportation by trucks, as the defendant determined which form of transportation would be used. Defendant contends that the fact that some of the employees had automobiles and could drive to the place of work rather than using the method provided by the defendant established the fact of choice. The fact is that the greater number of employees did not own automobiles and such employees as did not have automobiles cannot be said to have a choice of method of transportation because others owned automobiles. It is argued that the men were not ordered to use the transportation provided and there is no evidence in the record of any such direct orders by the defendant. However, the lack of evidence of such express orders in that regard is not at all controlling on the question. There is no need to order the obvious. The employees were reasoning human beings familiar with the details of the tasks that they were employed to perform, and required to some extent at least to use their own intelligence as to those details in performing the tasks without express command or direction by the employer in that regard, and it cannot be said that the employees are not working because the particular act necessary in the performance of their tasks, and without which the work that they were employed to do would not be done, was not expressly ordered or directed by their superior. The men were in the camp for one purpose only and that purpose was to perform productive work at their working places. Such was known to the employer and the employees. The working place was at some distance from the camp with only one method of getting there as to employees not owning automobiles. They knew there was transportation provided, where it left from, and the time of its departure. The employer knew that the employees knew if

they intended to work they could only do so by using the transportation provided. An order to board the goose or trucks would be nothing more or less than an order to go to work, and that would be entirely without purpose when the employee was there to the knowledge of the employer for the sole purpose of going to work. It could as well be argued from the evidence that when a saw or axe was given to the employee each morning, as he was not given any direct order to use that saw or axe in felling trees, such was furnished him primarily for his comfort and convenience.

In determining whether the transportation was or was not primarily in the interests of the defendant, one matter to be considered is what, if any, effect the failure of the defendant to furnish the transportation would have upon the business it was carrying on. It is obvious that as to those employees who did not own automobiles, and there being no other method of transportation except that furnished by the defendant, those men could not work. The defendant then, if it did not furnish transportation, would have available to it as employees only those who had automobiles and thus able to furnish their own transportation. Necessarily then, in obtaining employees, the defendant, in place of having access to an unrestricted and unlimited labor market, would have access only to a restricted and limited labor market—that is to only those seeking employment who owned automobiles. It cannot be said that in providing a facility which gave the defendant access to an unrestricted labor market it would not have had except for such facility, the facility was not provided primarily for the benefit of the defendant in carrying on its business, and without which it probably could not be carried on at all, or only to a limited extent. The defendant likens the travel from the camp to the working places by the employees with travel from home to the working places and thus not work. The boarding house and bunk facilities were supplied by the defendant and on its property because of the fact that there was no place else for the men to eat or sleep; no places for the men to board or to lodge within many miles of the camp and no system of transportation available between the nearest city and the camp. The facilities were provided by the defendant because of the necessity of its business and the remoteness of the places it had to be carried on. It was either a question of providing those facilities or not operating its business. In that respect its business could no more be carried on without supplying those facilities than it could be carried on without supplying the men with saws, axes and other tools needed by them in doing their work. Defendant argues that the men were not required to use the facilities, were not ordered to do so, and used them of their own choice. The record discloses that any choice the employees had was a "Hobson's" choice. In other words, their choice was between eating at the boarding house, sleeping in the bunk cars and working for the defendant, and not doing so and not working for the defendant. Facilities were supplied not for the purpose of furnishing the employees a choice, but in order that the men might work and the business of the defendant be carried on, and without which the work could not be carried on.

Defendant cites Dollar v. Caddo River Lumber Co., D.C., 43 F.Supp. 822. On reference to the citation it appears that in that case the Court rendered no opinion, did not set out the evidence from which the ultimate facts were derived, but set out only its findings of fact and conclusions of law, and for that reason the case is not helpful to the Court here. In the case of Sirmon v. Cron & Gracey Drilling Corporation, D.C., 44 F.Supp. 29, cited by the defendant, it appears that the question decided was the application of a Louisiana statute. The Court held, on the question as to whether the circumstances alleged would entitle plaintiff to claim wages for travel time to and from his work, the allegations were not sufficient without amendment to warrant a ruling by the Court, and the plaintiff was given leave to amend his complaint, and does not appear to be in point here. In the case of Bulot, et al. v. Freeport Sulphur Company, Inc., D.C., 45 F.Supp. 380, cited by defendant, the findings of fact and conclusions of law of the Court only are set out. No opinion was written by the trial Court, no synopsis of

the evidence given. For that reason the case is not of help here.

In the case of West et al. v. Texas Company, D.C., 65 F.Supp. 97, cited by the defendant, it appeared that the employees were transported to their working places by boats supplied by the company through contract with third persons. In its recital of the facts in that regard, at page 98 of 65 F.Supp., the trial Court recited that the plaintiff in the case, although regularly utilizing the boats, was free at all times to provide otherwise for his transportation, there having been always available other boats in or near the place of departure. The plaintiff testified that he could only provide himself with such other boats at an expense to him greater than the amount he was paid in his employment.

In my opinion the question presented here is not to be determined by the fact that an employee might obtain his own transportation at an expense greater to himself than he would earn by working at his employment, and for that reason I cannot be guided by the opinion in the case cited.

The defendant relies most strongly upon the case of Walling, etc. v. Peavy-Wilson Lumber Company, Inc., D.C., 49 F.Supp. 846. Because of the emphasis placed on the case by the defendant, and the able opinion written by the Court there, the Court has given the authority cited great consideration. It is first contended by the defendant that that case was cited with approval and the holding of the Court there adopted by the Supreme Court when it was cited by the Supreme Court in the Tennessee Coal Company case, and is thus binding authority on this Court. On reading the opinion of the Supreme Court it does not appear that the contention made is well founded. In the Peavy-Wilson Lumber Company case the lumber company owned the town of Holopaw. It is an inhabited community, situated upon a paved state highway, has all of the conveniences such communities have, such as stores, churches, schools, water and electricity so that electrical applicances may be operated in the homes. Many of the workmen live in the community with their families and pay rent to the company for their homes. They are not required to live there. Persons living there, engaged in business, who are not working for the company likewise pay rent to the company for their homes or business establishments. A train furnished by the company leaves each day, which takes the men to their places of work. The riding time consumes about an hour and a half. The workmen are not required to use the train and no charge is made when they do so. In that case and under those circumstances the trial Court held that the travel from the community to the place of work was travel from home to work and thus not compensable. Defendant asserts that under that decision the travel from the camp to work here is travel from home to work and likewise not compensable. The case was decided by the trial Judge prior to the decisions of the Supreme Court in the Tennessee Coal Company case, the Jewell Ridge case and the Mt. Clemens Pottery Company case and the trial Judge of necessity did not have the benefit of the views of the Supreme Court on the question. The facts in the case are so far different from the facts in the case here that the case is not authority here for the contention made. It is apparent in that case that the working men lived in a town, in an inhabited community having all the necessities of life for a family, such as stores, churches and schools, water, electricity for the furnishing of light and power, to electrical refrigerators, washing machines and other appliances used by the housewife in maintaining a home. The camp here was not within any town or inhabited community. It was not a place in which a man with a family could keep his family or rear it. There were no facilities provided whatsoever for the housing, care or accommodation of women and children, no stores, no churches, and no schools, no restaurants or food stores. The record affirmatively discloses that men having families maintained them in some other city or town or inhabited community. There is no evidence in the record that the foremen were present at the place the train departed, looking over the men, making such replacements as might be needed and giving such directions as they desired

to give and chose not to give at the working places as the evidence is here. There is no evidence in the record that in that case the men reported at the place the train left to determine whether or not, because of weather conditions, they would have work to do that day as the evidence is here. In the Peavy-Wilson Lumber Company case the Florida East Coast Railway ran trains from the town to the place of work and during most of the time a number of the employees, who completed their work earlier than the hour for the leaving of the company train, used that means of transportation to arrive at their homes. In addition, others used their automobiles. The Court there specifically found that under those facts the employees were at liberty to use any other conveyance or means of travel they chose. There was a choice in that case (different here). The employees could choose between riding the company train at no expense to themselves or riding a train provided by a common carrier at little expense to themselves, and because of those facts the Court concluded that the conveyance was furnished as an accommodation and convenience to the employees. The Court, in rendering its decision, considered the opinion of the District Court in the Tennessee Coal Company case, 40 F.Supp. 4, and distinguished that case because of the factual situation as to the great burden and hazard of the travel. It apparently was of the opinion that the burden of the travel was a controlling factor. The Supreme Court took a different view in its definition of the word "work" in the Tennessee Coal Company case. Again the Court was influenced in its decision by the fact that in the nature of a lumber industry some companies are required to transport men a greater distance to their working places than other companies and should the company transporting the men a great distance be required to pay them during the time of such transportation, it then could not compete in the world's market as readily as those companies who are not required to transport the men. The Supreme Court in none of the three cases decided by it has said this is a matter to be taken into consideration by the trial Court or is to be considered a test in determining whether or not travel time is work time.

 The Supreme Court said in the Tennessee Coal Company case that under the statute Courts are not dealing with mere chattels or articles of trade, but with the rights of those who toil, who sacrifice the full measure of their freedom and talents to the use and profit of others; that Congress specifically legislated to protect those rights and the statute must not be interpreted or applied in a narrow, grudging manner. This language must be kept in mind in determining the question of fact as to whether or not the time of the employee is devoted primarily for the benefit of the employer and his business even though at the moment it be not directly productive, or whether what he is doing at the moment is burdensome or not. It does not necessarily follow that because at the moment the employee is deriving some benefit or convenience to himself that he is still not devoting his time primarily for the benefit of the employer and his business. From the facts here the travel of the employees from the camp to their place of work was necessary if the employer's business was to be carried on. It was therefore necessarily pursued primarily for the benefit of the employer and not primarily for the comfort and convenience of the employees. As the productive aims of the employer in the Mt. Clemens Pottery Company case could not have been achieved without the walking on the part of the employees inside the factory, equally here the productive aims of the employer could not have been achieved without the riding by the employees in the conveyances from the camp to their place of work, and in the language of the Supreme Court in the Mt. Clemens case the riding involved "physical or mental exercise (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business", and constitutes time worked under the provisions of the Fair Labor Standards Act for which compensation is due.

Section Men.

From the foregoing the men employed as section men by the defendant were equal-

ly engaged in work while traveling to and from the place where their productive work was done. There is no contention made by the defendant insofar as the section men are concerned that there were roads leading to their place of work or other means of access thereto from the camp except by riding the speeder over the defendant's railroad.

Defendant asserts that there is a failure of proof on the part of the plaintiff in not proving that an employee or some employees worked in excess of 40 hours, including the time spent in traveling in any one work week, pointing out that the record does disclose that absenteeism is a usual daily occurrence. From the fact of absenteeism on the part of some employees and a resultant lack on the part of such employees to work 40 hours in any one work week, it cannot be assumed that all employees were absent during any work week. The record discloses that the business operated not less than 40 hours a week. The inference follows that men therefore worked 40 hours a week if the business operated 40 hours a week. Again, there is testimony in the record of men who have worked steadily for the defendant for years. In their testimony they fixed the time or approximate times that they did not work. They testified positively that they were not paid for travel time, being paid only for the actual time they spent working between 7:30 in the morning and 4:30 in the afternoon, and from this uncontroverted testimony the inference follows that these witnesses did work more than 40 hours in some of the weeks, including travel time. The defendant offered no evidence, made no contest as to the fact as to whether any or all of the employees worked 40 hours a week, including travel time, but contested the action entirely upon the theory that travel time, under the facts here, was not work time.

From the foregoing the Court is of the opinion that the plaintiff is entitled to the judgment prayed for in his complaint and findings of fact, conclusions of law and decree to that end and in conformity herewith will be entered.