Harry L. SPARKS and Rex Wanda Sparks, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 11803.

United States Court of Appeals Seventh Circuit.

Dec. 3, 1956.

---

———◆———

William P. Rosenthal, Leonard Schanfield, Chicago, Ill., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Karl Schmeidler, Atty., U. S. Dept. of Justice, Washington, D. C., Lee A. Jackson, I. Henry Kutz, David O. Walter, Attys., Tax Division, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and LINDLEY, and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This is an appeal from a decision of the tax court of the United States determining deficiencies in petitioners' income tax liability for the calendar years 1948 and 1949. They are husband and wife.[1] Their son, Joe C. Sparks, was born February 19, 1938. The relevant income came from a business of buying and selling hogs. In said calendar years, 15% was allocated by taxpayer to Joe as an alleged partner in a firm known as H. L. Sparks & Company.[2] The Commissioner disallowed that allocation and included that amount in taxpayer's income.

Based upon the stipulations of the parties and from evidence heard, the tax court found the facts as now stated.

Since 1920 taxpayer has been continuously engaged in buying and selling livestock. In 1931 the business was organized as a sole proprietorship under the name of H. L. Sparks & Company (hereinafter referred to as the company). From 1938 through 1949 the business of the company consisted of buying and selling hogs principally to packers and to traders and feeder buyers at National Stock Yards, Illinois. Most of its purchases were made as a dealer so as to fill orders already received; some purchases were made without prior orders but in the hope of resale. In either case the purchase and resale were generally made the same day. If resale was not made the same day and was not likely to be made the next day, the hogs were turned over to commission agents for resale. The company's volume of business varied from $10,000 to $150,000 daily. In 1948 and 1949 its gross receipts were over $15 million and $13 million respectively. Collections from customers were made by sight draft, by money-wire receipts, or by checks mailed after wire notification of amount due. These collections included taxpayer's commission which was added to the purchase price of the hogs shipped. Under the rules of the "exchange" the company was required to pay for its purchases by 3 P. M. of the day of the purchase. The company bore all of the risks of bad debts, credit losses and loss of inventory through death or illness of the livestock. Inventories were a minor factor in the company's business; at the end of 1948 and 1949 the inventories shown on its balance sheets were $2,035 and $2,017 respectively.

During the years 1938 through 1940 the company financed its purchases through a clearing house by short-term loans. To eliminate the financing charges thus incurred, taxpayer tried to borrow money from a bank but the bank wanted too much collateral. In 1940, taxpayer persuaded his wife, Wanda, to put about $5,000 of her own funds in the business. Prior to this time Wanda had made small loans to the business. On January 2, 1941, petitioners executed an agreement entitled "Partnership Agreement—H. L. Sparks Commission Company." The agreement provided that the business would thereafter be operated as a partnership with each having a one-half interest; taxpayer was to be in control of all business activities; Wanda was to receive no salary unless her services were required in the business; part-

---

1. Harry L. Sparks is also referred to herein as the taxpayer.

2. In various documents, petitioners also referred to the firm as H. L. Sparks Company, and H. L. Sparks Commission Company.

nership profits were to be divided equally; mutual consent to withdrawals of money was given and was to be revoked only upon written notice; withdrawal from the partnership was to be made only after appropriate written notice; the partnership interest of one partner was not to be assigned or sold without first being offered to the other partner at the book value on the date of sale. The agreement also stated that taxpayer had a one-half interest in Midwest Order Buyers, which was carried as an asset of H. L. Sparks Commission Company, and that by virtue of her interest in H. L. Sparks Commission Company, Wanda was to receive one-half of taxpayer's interest in Midwest, i. e., a one-fourth interest in Midwest Order Buyers.[3]

In an instrument dated December 30, 1941, it was stated that Wanda transferred to Joe her one-half interest, which included her one-fourth interest in Midwest Order Buyers. This transfer was made with the consent of taxpayer.

Wanda's purpose in making the transfer was to provide financial security for Joe. After a few years, when Midwest Order Buyers began to lose money, the interest in Midwest in Joe's name was taken off the books of H. L. Sparks & Company.

In March 1942, petitioners, upon their application, were appointed curators of the estate of Joe by a probate court in Missouri. In July 1942, an inventory and appraisal of the estate of Joe C. Sparks was filed with the court, showing its value as $3,000 in cash. For each of the years 1943 through 1953, the curators filed an annual settlement. That for 1943 showed that the estate had $2,900 in government bonds, $100 in a bank deposit, a one-half interest in H. L. Sparks & Company valued at $5,000, and a one-fourth interest in Midwest Order Buying Company valued at approximately $2,500. In settlements filed for the succeeding years Joe's partnership interests were valued as follows:

| | H. L. Sparks & Company | Midwest Order Buying |
|---|---|---|
| 1944 | $ 5,000 | $2,500 |
| 1945 | 5,000 | 2,500 |
| 1946 | 5,000 | 2,500 |
| 1947 | (no report in evidence) | |
| 1948 | 5,000 | 2,500 |
| 1949 | 15,166.56 | 2,500 |
| 1950 | 17,166.56 | 3,500 |
| 1951 | 14,732 | 3,500 |
| 1952 | 12,732 | 3,500 |

Attached to the 1953 settlement was the following statement of Joe's personal and capital accounts in H. L. Sparks & Company for the years 1946 through 1952:

| 12/31 | Balance Beginning of Year | Distribution of Profits | Drawing | Balance End of Year | Capital Account |
|---|---|---|---|---|---|
| 1946 | $17,168.95 | $16,980.20 | $ 5,432.99 | $28,716.16 | $5,000.00 |
| 1947 | 28,716.16 | 9,292.91 | 19,703.00 | 18,306.07 | 5,000.00 |
| 1948 | 18,306.07 | 24,316.97 | ........ | 42,623.04 | 5,000.00 |
| 1949 | 42,623.04 | 9,039.14 | ........ | 51,662.18 | 5,000.00 |
| 1950 | 51,662.18 | 5,390.71 | ........ | 57,052.89 | 5,000.00 |
| 1951 | 57,052.89 | 4,642.61 | 1,407.94 | 60,287.56 | 5,000.00 |
| 1952 | 60,287.56 | 197.65 | 842.55 | 59,642.66 | 5,000.00 |

Upon examination of partnership returns filed by petitioners for 1941 and by taxpayer and Joe for 1942 and 1943, a revenue agent determined that the entire income of the partnership was taxable to taxpayer, who accepted that determination. He reported for 1944 and 1945 the entire income of the partner-

3. Sometimes referred to hereinafter as "Midwest Order Buying Company", "Midwest Order Buying", or "Midwest".

ship in his individual income tax returns.

No partnership returns were filed for H. L. Sparks & Company for 1944 and 1945, and no allocation of earnings for those years was made to Joe on the company's books. For 1946 a partnership return was filed, showing an allocation of the company's earnings equally between taxpayer and Joe. For 1947, and subsequent years, 70% of the company's income was credited to taxpayer for his services and the remaining 30% of its income was divided equally between taxpayer and Joe.[4] The determination to allocate 70% of the partnership profits to taxpayer for services and to divide the remaining 30% between Harry L. Sparks and Joe C. Sparks was made upon the advice of J. H. Gilby, Sr., a certified public accountant.

■ In deciding the controlling question of whether taxpayer and Joe were business partners in 1948 and 1949, the tax court made a determination of facts, based on a stipulation of the parties, evidence introduced in court, and the inferences which it drew from both. We are not permitted by Rule 52 of the Federal Rules of Civil Procedure [5] to disturb these findings unless we can say that they are clearly erroneous. Commissioner Inv. of Internal Revenue v. Scottish American Co., 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113;[6] Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 5 Cir., 137 F.2d 176, affirmed 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; Gaytime Frock Co. v. Liberty Mut. Ins. Co.; 7 Cir., 148 F.2d 694. This we cannot say after examining the whole record before us.

Summarized, the facts as found by the tax court are now stated.

Joe contributed no personal services to the alleged partnership between 1941 and 1949. He made no capital contribution to the business. The only new capital that came into the business was that contributed by Wanda late in 1940, and this was contributed with the alleged intention that Wanda, not Joe, become a partner. There was no real intention to make Joe a partner. The business being conducted by Harry was a personal service business, dependent for its success on his skill and energy. It was financed largely by Harry's depositing sales checks received by him before his own checks given in payment for hogs cleared his bank. Principally by this method he was able to finance the large gross sales of the business. This is not to say that Wanda's $5,000 contribution may not have been important to the business when received. There was no partnership agreement between Harry and anyone acting on Joe's behalf. The assignment from Wanda to Joe stated that it was subject to the agreements (of January 2, 1941 and December 20, 1941) between Harry and Wanda. There were year-to-year changes in the percentage of Joe's alleged partnership earnings, and a few years after 1941 Joe's interest in Midwest Order Buying was simply eliminated at Harry's sole direction because Midwest began to show a loss, thereby making it appear that Joe was a "partner" sharing only in the *gains of the business but not in the losses*. The actual control of the business and its earnings remained in Harry. Earnings were allocated to Joe on the company's

4. We construe this finding as referring to partnership returns filed for those years.

5. 28 U.S.C.A. Rule 52.

6. In the Scottish American Co. case the court, 323 U.S. at page 123, 65 S.Ct. at page 171, said:
 " * * * The sole issue revolves about the propriety of the inferences and conclusions drawn from the evidence by the Tax Court. The taxpayers claim that these determinations are supported by substantial evidence and hence were not reversible by an appellate court. * * *
 " * * * The Tax Court has the primary function of finding the facts in tax disputes, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable. The Circuit Courts of Appeal have no power to change or add to those findings of fact or to reweigh the evidence. * * * "

books (except in 1944 and 1945) *but never distributed,* and were used in the business. In stating the amount of Joe's partnership interest, there were glaring inconsistencies between the annual settlement statements filed by petitioners as curators of Joe's estate and the company books.

These factors indicate that petitioners were merely going through the formalities without any real intention that taxpayer and Joe be partners. The only intention of taxpayer and Wanda in setting up the arrangement was to provide for Joe's financial security. There is no evidence of any intention to make him a real business partner. Taxpayer indicated that he agreed to his wife's request to turn over her interest in the business to Joe in order to build up an estate for the boy, since taxpayer was loose with his money, was older than Wanda and had a married daughter by a first marriage.

The tax court specifically held that petitioners failed to sustain their burden of showing that there was a good faith intention that taxpayer and Joe join together in the "present" conduct of the business, and failed to show that they were partners during the taxable years in question.

We are not here concerned with the question of whether the plan of operation now under consideration constituted a valid partnership under state law. We are concerned, however, with the question of whether the alleged partnership was in fact a partnership, entitled to recognition under the Internal Revenue Code [7]. The test is stated in Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659:

> " * * * whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."

In Settos v. United States, 7 Cir., 192 F.2d 521, at page 522 we said that whether or not the parties in a given case intended to form a copartnership is a question of fact. To the same effect is our holding in Schallerer v. Commissioner, 7 Cir., 203 F.2d 100, 103.

There is no showing that at the time Wanda transferred to Joe her claim to a share in the partnership profits, the taxpayer had any need of a capital contribution, such as existed a year earlier when he received $5,000 from her and entered into the original partnership agreement on January 2, 1941.

While taxpayer attached to Wanda's original capital contribution more significance than did the tax court, it must be borne in mind that the question of capital contribution is but one of the circumstances to be considered in determining the basic issue, whether there was a bona fide intention to join together in the conduct of the alleged partnership in the taxable years here involved. Negating the existence of such an intention are various circumstances, including the following: Earnings were allocated on the company's books to Joe (except in 1944 and 1945); however, they were never distributed to his curators for his estate, and were used by the business except to the extent necessary to pay Joe's alleged federal income taxes. The annual settlement statements, which, as curators, petitioners filed, were grossly inconsistent with the partnership books in setting forth the amount of Joe's alleged partnership interest. There actually never was any partnership agreement between taxpayer and anyone on Joe's behalf and the assignment from his mother to him was subject to agreements between his parents.

---

7. 26 U.S.C.A. §§ 181, 182.

Under the circumstances in this case, we agree with the Tax Court that a desire and an intent to provide for the minor child's financial security is a far different thing from an intent to go into business with him. Consistent with a provision for the child's financial security, but inconsistent with a partnership, are the facts that in 1941, 1942, and 1943, half of the profits were allocated to Joe, in 1944 and 1945 nothing was allocated to Joe, in 1946 one-half was credited to Joe, and thereafter 15 percent, and the "elimination" of Joe's interest in Midwest Order Buying by taxpayer because it was showing a loss and the taxpayer and his wife did not want Joe to "stand part of the loss".

There is substantial evidence and reasonable inferences therefrom to support the findings of fact by the Tax Court, and its application of the law thereto is in accordance with the rules enunciated in the cases to which we have just referred.

Therefore, the judgment of the tax court is affirmed.

Judgment affirmed.