Robert BLUM et al., Plaintiffs,

v.

SCHUYLER PACKING COMPANY and Spencer Foods, Inc., Defendants.

Civ. No. 03647.

United States District Court, D. Nebraska.

April 2, 1974.

Plaintiffs are a number of present and former employees of defendant Schuyler Packing Company, a meat packing concern whose office and plant are located in Schuyler, Nebraska. Schuyler Packing is a wholly owned subsidiary of defendant Spencer Foods, Inc., a Delaware corporation, with its principal offices in Spencer, Iowa. Schuyler Packing commenced meat packing operations in September of 1968 and at the times material to the present issue (September, 1968, to December, 1970) it employed a number of the plaintiffs herein at various times and continues to employ others at the present.

The plaintiffs bring this suit under the Fair Labor Standards Act of 1938 (F.L.S.A.), specifically Section 16(b) thereof, 29 U.S.C. § 216(b),[1] challenging the manner in which the defendants compensated (and compensate) them for their work on the "kill floor" in the Schuyler Plant. Jurisdiction is premised upon Section 216(b) and 28 U.S.C. § 1337.

The plaintiffs contend that the method utilized by the defendants in computing their compensable wages, commonly referred to as a "gang time" method does not properly account for actual compensable time worked by individual employees at the plant and is, therefore, violative under the F.L.S.A.

The stipulation asks this Court to determine whether the practice outlined in the stipulation of facts is violative of the Fair Labor Standards Act. To show a violation of Section 16(b) of the Act an employee has the burden of adducing evidence that he has performed compensable work for which he was not properly compensated. Anderson v. Mount Clemens Pottery Co., 328 U.S. 680, 686, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

Jacobs, Gore, Burns & Sugarman, Chicago, Ill., for plaintiffs.

Swarr, May, Smith & Andersen, Omaha, Neb., for defendants.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This matter has been submitted to the Court on a stipulation of the parties for decision on a pivotal issue of their dispute.

1. Section 216(b) provides in pertinent part: Any employer who violates the provisions of Section 206 or Section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

■ At first blush, it appears that plaintiffs have shown such a discrepancy between work done and amount of wages paid since the parties say in their statement of the issue and at other points in the stipulation that the individual time cards show more time worked than do the spread sheets, which reflect the gang time computations. However, this is somewhat misleading. There is no stipulation as to the accuracy of those time clock records and this is a material fact issue which cannot be presumed in the context of the present decision. Clearly, the mere existence of time clock records without proof that they "mirror the (actual) working time" are not an "appropriate measurement of the hours worked." Anderson v. Mount Clemens Pottery Co., *supra*, 328 U.S. at 689–690.[2] The Court must, then, look elsewhere for facts or inferences that show the employees involved herein were paid less under the facts outlined in the stipulation than they should have been, thus violating the F.L.S.A. The stipulation is attached hereto and by this reference made a part hereof and will only be referred to in specific instances hereinafter.

### PER SE INVALIDITY

Plaintiffs first argue that the method of gang time payment is per se unlawful under the Act because individual employees are paid on the basis of gang time. It cites cases where courts have held that where employees are paid on an "average" or "assigned" number of hours rather than actual hours worked, the method is improper. Wirtz v. Williams, 369 F.2d 783 (5th Cir. 1966), and McComb v. LaCasa Del Transporte, 167 F.2d 209 (1st Cir. 1948), were such cases. Therein employers paid truck driv-

er-employees on the number of hours assigned to a particular trip rather than the actual hours spent making the trip, and the Courts found the employers had improperly compensated those drivers under the Act. Plaintiffs further cite cases that hold an employee must be paid on the actual number of hours worked. Triple "AAA" Co., Inc. v. Wirtz, 378 F.2d 884, 887 (10th Cir.), cert. denied, 389 U.S. 959, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967), and Goldberg v. Cockrell, 303 F.2d 811 (5th Cir. 1962), are illustrative. In both cases, employees were paid on a basis that was unaffected by the actual number of hours worked.

■ The Court is constrained to reject plaintiffs' position under the rationale of the above cases. Of course, that position is that individual employees at the Schuyler Plant are paid on the "assigned" computation of one employee, the "knocker", and not on actual hours worked. First of all, it is not clear that the procedure outlined in the stipulation necessarily results in an average or assigned number of hours as the basis for an individual employee's wages without regard to actual work completed each day by that employee. The concept of gang time is reduced to its simplest form by the following example: If A works from 6:30 a. m. to 3 p. m., then he puts in the same amount of time as B who works from 6:45 a. m. to 3:15 p. m., and C who works from 7 a. m. to 3:30 p. m. No disregard for actual hours worked is inherent in such a method. Additional facts may show that the application of such a method could result in underpayment, but the concept itself does not automatically contemplate this defect. Furthermore, it is an incorrect reading of the above cases to

2. Paragraph 24 of the stipulation provides: Because of their inability to reach agreements on certain factual details, the parties have purposely left ambiguities in this Stipulation of Facts to enable each party to argue its version of those factual details in its brief. However, the parties will supply the Court with such additional information as it shall request.

Pursuant to this paragraph the defendant contends that the records do not reflect true working time because the employees check in and out erratically. Suffice it to say that whatever the facts might be, the Court is limited to the stipulation which is devoid of any adequate foundational facts to show that the time records "mirror working time."

deduce that the methods in themselves were improper. In Wirtz v. Williams, *supra,* the Court explicitly stated that there was "substantial evidence to support a violation of the Act's wage and overtime compensation provisions" since there had been testimony that the "normal work day was eleven to twelve hours" which was more than the employees were being paid for. *Id.* 369 F.2d at 785. In *McComb*, the Court stated:

> It is also *in the evidence* that the estimated hours, or "average hours", recorded on the payroll were frequently less than the actual hours worked, . . . (emphasis added)
>
> *Id.* 167 F.2d at 210.

Thus, those courts did not reject a system *ipso facto* because it was based on averages. It did so only after evidence was adduced to show that the method did not reflect actual work performed. It was not the means, but the end, that resulted in rejecting the payment method.

## GANG TIME AS USED BY DEFENDANT

The plaintiffs' position in regard to the illegality of the gang time method as used by defendants is reduced in its brief to two main topics: First, the method utilized by the defendants as agreed to in the stipulation of facts is inherently unreliable because (a) its computation involves too much guesswork, exercised by a company-interested employee, the foreman of the kill floor; (b) the hours worked by the "knocker" are not representative of the time worked by individual employees; and (c) the system shortchanges the employees of actual working time at both the beginning and end of their workday. Secondly, plaintiffs contend the failure of the defendants to have adequately kept records of how the employees were paid for this period of time requires that the employees prevail in this matter.

Before dealing with the substance of the plaintiffs' contentions in the first portion of their argument, the Court is constrained to define plaintiffs' assertion as to the inadequacy of the records. The stipulation shows that although individual time clock cards are available, the following records are not: 1) records of chain speed; 2) records of the designated starting times; 3) records of the punch cards prior to January 2, 1971, on which the foreman punched out when the last beef left the chain; 4) records of down time occurring after the last beef was stunned by the knocker (although records of total daily down time kept by the foreman are available with the exception of the 1968 records) or the stations which were affected thereby. Plaintiffs' brief seem to be arguing that the failure of the defendant to keep these records automatically shifts the burden to the defendant to show that the method used by them adequately compensates the individual employees. The Court believes this is an incorrect statement of the applicable standard in this case. The F.L.S.A. does require that an employer subject to its provisions maintain adequate records.[3] The Administrator has promulgated a voluminous set of regulations pertaining to the record-keeping requirements of employers. 29 C.F.R. Ch. V, §§ 516.1 to 516.33. The Court agrees with the plaintiffs that the defendants herein should at least have maintained more adequate records of the designated starting times, the punch cards the foreman made when the last beef left the chain, and the chain speeds involved on the various days. These

3. 29 U.S.C. § 211(c) provides:

(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

**1030**

records theoretically provide the very basis upon which the employees are paid under the gang time method. Defendants argue that the spread sheets (which reflect the gang time) are sufficient, but as the Court understands them, they merely represent the total number of hours worked as computed by the defendant. They offer no record of what those total hours are based upon. Cf. 29 C.F.R. § 516.2(a)(5), (10).

■ The failure of the defendants to maintain more complete records, however, does not automatically shift the entire burden on them to prove adequate compensation. The burden of an employee and his employer in the situation where records are vague and uncertain was succinctly stated in Anderson v. Mount Clemens Pottery Co., *supra,* 328 U.S. at 687. Therein, the Supreme Court stated:

When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on the employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden *if he proves that he has in fact performed work for which he was improperly compensated* and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with the evidence of the

precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. (emphasis added)

*See also,* Hodgson v. Humphries, 454 F. 2d 1279, 1282–1283 (10th Cir. 1972).

■ It is clear then that the mere failure of the defendants to keep adequate records, in the absence of the employees showing that they have in fact performed work for which they were improperly compensated, does not entitle plaintiffs to prevail in this matter. The Eighth Circuit has held that courts must apply "practical standards in evaluating whether an employee's evidence justifies any recovery under the Act." Mitchell v. Williams, 420 F.2d 67, 70 (8th Cir. 1969).

■ Under the foregoing standard the Court must in the first instance address itself to whether there is indeed sufficient evidence in the stipulation of facts to support a finding that the employees were not paid for work actually performed. The parties are reminded that the Court cannot and will not decide the validity or invalidity of the concept of gang time in the abstract or in a vacuum, but can do so only under the evidence and proper inferences to be drawn therefrom as set forth in the stipulation of facts. The Court thus proceeds to assess the arguments of the parties as they bear on the stipulation presented to it in light of the foregoing standard.

■ At the outset the Court summarily rejects the position in Subsection (c), *supra,* in which the plaintiffs contend that gang time does not take into consideration certain activities such as knife sharpening and cleanup. No evidence is before this Court that these employees are required to or in fact do any preliminary activities before starting their work at their stations at the designated starting times, nor that they are required to or do any "cleanup" duties thereafter. Although it would be material to a determination of the adequacy

of the defendants' overall compensation of their employees, Mitchell v. King Packing Co., 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956); Tennessee Coal Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 599–602, 64 S.Ct. 698, 88 L.Ed. 949 (1944); 29 C.F.R. § 785.24, et seq., it is not an attendant and necessary evil of the gang time method defined in the stipulation before this Court. Also, defendants' reference to early shifts and waiting time as non-compensable time may be important to some cases, Skidmore v. Swift & Co., 323 U.S. 134, 136–137, 65 S. Ct. 161, 89 L.Ed. 124 (1944); Blum v. Great Lakes Carbon Corp., 418 F. 2d 283 (5th Cir. 1969), cert. denied, 397 U.S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970); Glenn L. Martin Nebraska Co. v. Culkin, 197 F.2d 981 (8th Cir.), cert. denied, 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 671 (1952); 29 C.F.R. § 785.-14, et seq., but again this Court has been presented no evidence relating to this. The above issues clearly depend on the facts of each case and they are impossible to relate to the present matter, in the absence of those facts.

Moving then to the plaintiffs' contention that the gang time method is inherently unreliable, it first calls the Court's attention to the time being computed, in large part, by reference to a chain speed which it claims is not an accurate determination, but only an arbitrary assessment of supposed chain speed. It contends that the time clock records of the knocker were available and if anything, they should have been used to make the determination. Further, it contends that the kill floor foreman, who has as one of his primary responsibilities the efficient operation of the kill floor and the reporting of the gang time to his superiors, is in a position where it would be to his advantage to overestimate the chain speed or to punch the card before the last beef reaches the end of the line, all of which would decrease the gang time.

The plaintiff further contends that the system is unreliable because the knocker's hours are not representative of the hours worked by other employees in that the nature of the work done by the knocker requires that he spend only a few seconds on each beef while other employees spend much greater amounts of time. He utilizes the following example to illustrate this point. Assuming that the knocker's designated starting time was 6:30 a. m. and that the last beef leaves the chain at 3:52 p. m., and that the chain speed is twenty-seven minutes, gang time would equal eight and one-fourth hours (6:30 a. m. to 3:52 p. m. equals nine hours, twenty-two minutes, minus five minutes lead time, minus thirty minutes lunch, minus twenty-seven minutes chain speed, equals eight hours, twenty minutes which reduced to its nearest quarter would equal eight and one-fourth hours compensable time). Assuming a knife man started at 6:45 a. m., the first beef should arrive at his station fifteen minutes after the knocker stunned his first beef. The last beef having been stunned at 3:20 p. m. (according to computation of subtracting chain speed of twenty-seven minutes and lead time of five minutes), it would reach the knife man at 3:35 p. m. If he spent five minutes on the beef he would be finished at 3:40 p. m., which means he had worked eight hours and twenty-five minutes (6:45 a. m. to 3:40 p. m. minus thirty minutes for lunch) which would be rounded off to eight and one-half hours, or one-fourth hour more compensable time than gang time computation. Plaintiffs argue that this discrepancy stems from the difference in amount of time worked by the knocker and the knife man and is representative of the greater amount of time worked by other individual employees.

It is at once clear from the reading of the stipulation that many facts which could bear on this Court's assessment of the validity of the present method of paying on gang time are not included. Of primary concern to the Court is the manner in which the "down time" [4] and "railouts" [5] are accounted for in computing gang time. Whether, in fact, they

---

4. See item 6 of the attached stipulation.

5. See item 7 of the attached stipulation.

are added on to the basic gang time for those employees whose stations are thereby affected or not is of vital import to the ultimate issue of whether the method adequately compensates individual employees. The briefs are replete with contentions as to how "down time" is dealt with. Defendants claim it is accounted for by the foreman even as to the "down time" resulting after the last beef is stunned. Plaintiffs maintain that since records are not available for the "down time" on the last beef stunned, it necessarily follows that it is not taken into account. Also of concern to the Court, is the designated starting time of the various employees alluded to in the stipulation.[6] Is the Court to infer from the stipulation that the starting times reflect the time that employees paid under the gang time method actually start doing compensable work? The plaintiffs' brief argues to the contrary, but there is nothing in the stipulation from which it can be inferred that the method therein defined necessarily results in an employee's being at his station prior to the designated starting time except the reference to the punch cards showing an earlier time than the designated starting time. The adequacy of any method of payment when there is no agreement as to how the time computation is made nor as to the facts relevant to determining whether it takes into account the work performed by the employees at the plant is difficult to determine. As stated above, any reference to a sterile concept of gang time does not benefit this Court in making a determination as to whether or not it is legal under the Fair Labor Standards Act. Furthermore, as held above, the time card records have not been stipulated to as accurately reflecting working time and hence any inference to be drawn from that fact alone is dissipated.

■ Enough has been said as to what the stipulation *does not* purport to explain to the Court about the operation of the gang time method. The stipulation *does* define a system of payment that would likely result in underpayment to individual employees *if* "down time" and "railouts" are not accounted for, or *if* the kill floor foreman arbitrarily "picks" a chain speed for the day that is incorrect, or *if* the individual employees are otherwise required to work more hours than those computed by reference to the knocker time (gang time). The precise and ultimate issue which this Court is asked to decide is whether the evidence that is included in the stipulation is sufficient from which inferences can be made that employees are in fact paid inadequately for the amount of work actually done in the plant. The Court cannot infer from the mere fact that the gang time method involves a computation of chain speed of the kill floor foreman that it results in underpayments to the employees. First, the Court does not find that it logically follows that since the kill floor foreman is an employee of the defendant that he will or has intentionally utilized the gang time procedure to reduce compensation thereunder. This is a strong contention and the evidence simply does not support it. The speed of the chain is set daily by the plant manager and there is nothing in the evidence besides the failure to maintain records of this chain speed that would properly support an inference that the foreman does not utilize the actual chain speed in making his computations. The Court cannot accept plaintiffs' argument that the foreman is required to make an arbitrary assessment of the speed of the chain or to guess at the chain speed.

■ As to plaintiffs' argument that the gang time method is improper because the knocker time is not representative of the time worked by the other individual employees, again there is simply no evidence to support this contention. The plaintiffs' example of the knife man working five minutes longer than computed gang time is of little help to this Court as it is based on facts not

6. See item 9 of the attached stipulation.

in evidence and of which this Court may not take judicial notice: namely, that the knife man's job takes five minutes and the knocker's only a few seconds. Certainly it represents a possible infirmity in the gang time method, but the Court cannot make a reasonable inference of underpayment upon speculation or possibility that discrepancies may exist.

As to plaintiffs' argument that "down time" is not accounted for, at least as to the "down time" occurring after the knocker has stunned the last beef, it is quickly seen that this is based on the failure of the employer to keep records on down time occurring after the knocker has stunned the last beef. However, a record of what purports to be the total "down time" for each day is kept by the kill floor foreman and there seems to be no disagreement in the stipulation that this "down time" is taken into account in making the final computation of gang time. From the evidence presented here, it is just as reasonable for this Court to infer that the defendants account for all down time after the last beef is stunned as it is to infer that they do not so account.

▆▆ In actuality, the Court is asked to determine whether a system that has *potential* for depriving employees of wages, *if* applied in a given manner, is violative of the Fair Labor Standards Act. That Act is clearly remedial in nature and the Court has attempted to construe the evidence in a practical manner. However, even though plaintiffs should not be imposed with an impermissible burden, they must still produce evidence that they are doing work not compensated for. Anderson v. Mount Clemens Pottery Co., *supra*, 328 U.S. 680. This Court cannot base a decision on speculation or conjecture as to what the gang time method might do, nor on hypotheticals with facts not in evidence, nor on arguments of counsel. It must confine itself to that evidence, and only that evidence and the reasonable inferences to be drawn therefrom, that the parties have specifically authorized it to consider in making its decision. On the basis of such evidence, the Court finds that plaintiffs have not sustained their burden of proving that they have, in fact, suffered a deprivation of wages for compensable work under the system defined in the stipulation.

The Court does not intimate by this decision that the F.L.S.A., with its employee-oriented history, would encourage a system that could result in unfair compensation to those employees operating thereunder. Such a possibility exists whether it be a gang time system or any other. Certainly, some represent less possibility of error than others, but notwithstanding this consideration, as this Court understands the law, a showing of discrepancy between hours worked and wages received would be a condition precedent to rejecting either. The Court has approached this matter with the foregoing considerations in mind, fully appreciating that the burden of this showing of discrepancy should logically be less in a system with greater possibilities of underpayment, where records are less than model.

▆▆ This case has been on file since September 21, 1970. Three separate district judges have been asked to guide it to final resolution. Detailed and comprehensive discovery has been undertaken, and ample opportunity given the parties to develop the evidence and inferences to support their respective positions as to the "kill floor" employees. This directed energy culminated in the stipulation now under discussion. That stipulation simply does not present the evidence sufficient for this Court to draw the logical inference that the method of payment contemplated therein results in underpayment to employees who are paid thereunder. To say the least, the stipulation did not present any concrete evidence of discrepancy between actual hours worked and hours compensated for under the gang time system. At most the Court was asked to engage in a reasoning process requiring inferences to be drawn from inferences, and at times inferences based upon speculation and possibility. This posture of the

evidence was compounded by the parties' failure to stipulate on material points involving the actual operations of the system, such as discussed above. Suffice it to say, the Court is of the view that the F.L.S.A. was not intended to infringe upon the rights of employers to develop a method peculiarly suited to their businesses by condemning it upon a mere *possibility* that, if applied in a given manner, it would result in undercompensation. In a nutshell, that is what the Court was asked to do.

In conclusion, it is the finding of this Court that plaintiffs have failed to sustain their burden of proving that the method defined in the stipulation presented to this Court compels any relief to them under Section 16(b) of the Fair Labor Standards Act. A separate order shall be entered this day accordingly.

## STIPULATION

To: THE HONORABLE ALBERT G. SCHATZ, District Judge:

A. This stipulation of facts, along with the briefs which will be submitted by the parties, is submitted to the Court for determination of the liability in one limited but overriding area, to-wit: The legality under the provision of the Fair Labor Standards Act of 1938 of paying employees on a computed gang time basis rather than on the basis of the time on their individual time cards, where the time reflected on the time cards is greater than computed gang time.

B. Plaintiffs have limited their discovery of documents herein to those maintained during the period 1968 through 1970 and have made no attempt to calculate any differences between clock time and gang time for the years 1971, 1972 and 1973. Plaintiffs have not reviewed or analyzed any Company records for the period January 1, 1971 to date, except the punch cards referred to in ¶ 8 of the Stipulation of Facts where no punch cards were available prior to January 1, 1971. Consequently, for purposes of this Stipulation, all facts relate to the period September 23, 1968 through December 31, 1970. It is understood and agreed by the parties that by limiting this Stipulation to the period 1968 through 1970, Plaintiffs are in no way waiving any rights or claims to wages which might be owing employees since January 1, 1971.

C. If the Court determines that the practice as outlined in the Stipulation of Facts hereafter is not violative of the provisions of the Fair Labor Standards Act of 1938, the parties agree to attempt to work out a settlement of issues involving employees who are not employed on the kill floor and as a result are not affected by the gang time policy of the Employer. The Employer-Defendant admits there may be a possibility of some liability for payments to employees not in the kill floor department and some possibility of inaccuracies affecting employees on the chain and elsewhere during initial operation of the plant. This Stipulation is made and agreed to by the Defendant here without any complete or strict admission of liability, but is only made by the Plaintiffs and Defendant for the purpose of narrowing the issues and for the information of the Court. If the Court should determine that the computed gang time payment of the Defendant is in violation of the provisions of the Federal Fair Labor Standards Act of 1938, as amended, and then in such event thereafter negotiations do not result in a settlement, the parties shall advise the Court, and the Court shall hear the following issues:

1. Liability on claims not related to computed gang time;

2. The total amount of damages due to the Plaintiffs;

3. The amount of liquidated damages, if any, due to the Plaintiffs;

4. The amount of awardable attorneys' fees and expenses due to the Plaintiffs.

D. In the event that the Court should find for the Plaintiffs on the issue of liability, the Plaintiffs and Defendant agree that the matter shall not

be considered to be fully and finally determined for purposes of appeal until the second part of the trial has been completed. The parties further agree that the matter shall not be considered to be fully and finally determined for purposes of appeal until the second part of the trial has been completed. The parties further agree that any issue or argument on liability on the issue set forth in ¶ A above which is not raised in briefs or oral argument, if any, prior to the hearing provided in ¶ C above may not be raised on appeal. In the event, however, the Court should determine that the Defendant is not in violation of the Fair Labor Standards Act of 1938, as amended, in connection with its practice of paying gang time as opposed to the use of the time cards, then and in such event, it is agreed that a final order may be entered as to this issue for purposes of appeal by the Plaintiffs without any prejudice to any claim or rights preserved regarding any issue other than gang time.

E. Based on the earlier statement to the Court, it is agreed that the matter may be considered to be submitted at any time during the month of October and for this reason the parties have agreed that the Stipulation of Facts would be submitted by the 30th of November and the briefs will be submitted by the 24th day of December, 1973. No reply briefs are contemplated; however, upon a party's request, substantial showing of necessity and notice to the other party, or upon the agreement of the parties, the Court may consider reply briefs.

F. In the event that the Court should require argument or hearing on the matters under submission, the Defendant agrees that the Plaintiffs should not be required to appear for any such hearing during approximately the last week in October, because of the absence of counsel from the country at that time. No request is made by either party for a hearing or argument on the limited submission covered by the Stipulation of Facts; however, upon request by either party, and if the Court deems it necessary or desirable, the parties may present oral argument.

## STIPULATION OF FACTS

It is hereby stipulated by and between the parties, and subject to the foregoing limitations, as to the following:

1. The Court has jurisdiction in this matter.

2. Schuyler Packing Company commenced beef slaughtering operations on September 23, 1968. Prior to that time, the plant was in construction. Some of the individuals employed for purposes of construction remained to work in the plant.

3. A collective bargaining agreement was entered into between Schuyler Packing Company and the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, effective from May 5, 1969 through May 5, 1971.

4. Slaughtering is done on the kill floor, where the beef travels on a chain through various stages; and the workmen on the chain are kill floor employees, under the supervision of a kill floor foreman. The jobs on the chain are described on the document attached hereto as "Exhibit A".* In addition to the jobs on the chain, workers are employed in the cooler, offal, maintenance, sanitation, rendering, hides and stockyards departments. The only department involved in this Stipulation of Facts is the kill floor.

5. The beef move from the holding pens in the stockyards into the plant. The beef is first stunned by the "knocker", the first employee on the kill floor. The beef is then shackled and hung on an overhead chain which moves the beef through the plant at a constant speed, in absence of breakdown. The chain, which runs the length of the kill floor, is in three sections. Each section runs approximately one-third of the length of

---

* Exhibits omitted for purposes of publication.

the chain. If the first section of chain breaks down, the second and third sections can continue to operate in order to move the beef then on the chain off the kill floor. If the second section breaks down, only beef on the third section can be moved. If the third section breaks down, no beef can be moved. The speed of the chain is set daily by the plant manager. The Company does not maintain records of chain speed.

6. When the chain stops due to breakdowns, shortage of beef, etc., this is called "down time." A record of what purports to be the total down time for each day is kept by the kill floor foreman, although such records for 1968 are not available. No records have been kept of down time on each section of the chain, or when, during the day, such down time occurred. There is no separate record of down time occurring after the knocker has stunned the last beef. The chain also may be stopped during government inspections which sometimes is or sometimes is not included in down time.

7. At one station along the chain, an employee may be directed to pull a beef off the chain. This is called a "railout." Subsequently, an employee is directed to place the railout back on the chain where it then must be processed to the end of the chain by the end of each working day. Railouts might be put back on the chain after the knocker stuns the last beef.

8. When the last beef is processed to the end of the chain, the foreman or an employee designated by him punches out a card in the time clock. Such punch card is identical in printed format to the time card punched by the employees. Under the first column entitled "IN", the foreman usually records the number of minutes over or under daily time rounded off to the nearest quarter; in the last column entitled "OUT", he punches out on the time clock the time when the last beef leaves the chain and in the column entitled "TOTAL", he writes computed gang time.

Punch cards prior to January 2, 1971 are not available. The time punched out by the foreman on the punch card is never the same time as punched out on the time card of the last employee on the chain and is rarely the same time as punched out on the time card of any other employee on the chain.

9. The starting time, designated by the foreman, is posted and generally it remains the same for periods of time. The Company sets the daily starting times for kill floor employees at fixed intervals for each station down the length of the chain. By calculating the speed of the chain and the distance from the knocker to each station, the Company deduces at what time the first beef will arrive at each station and it then designates such time as the set starting time for the employee assigned to that station. Permanent records of such set starting times do not exist. The starting time set by the Company for each station would never be the same time as that which the employee punches in on his time card. In almost every instance, the set starting time would be later than the time at which the employee punched in at the time clock.

10. The Company has three standard time clocks which are located in the maintenance, cooler and kill floor departments, respectively. Each time clock prints the time of day to the minutes on the card inserted in the apparatus. Each time clock at Schuyler is, at all times, relevant, accurate to within five minutes.

11. The time clock which is used by kill floor employees and the kill floor foreman is located at the end of the chain (the other end from the knocker). Each kill floor employee punches his time card in on this time clock when he reports to work and punches out on this time clock. Employees do not punch out or in for lunch; each of them punches his time card only twice a day. Weekly time cards for each individual employee, bearing daily in and out punches have been kept by the Employer since the

commencement of slaughter operations. All weekly time cards have been preserved by the Company.

12. As part of his induction, each new employee is shown the time clock and how to punch in and out.

13. All kill floor employees were at all relevant times paid according to the time which the Company records for the knocker, hereinafter called knocker time. The Company designates a fixed starting time for the knocker. The fixed starting time would be later than the time which the knocker punches in on his time card. The Company computes the knocker time as the span of time between the fixed starting time and the time which the foreman calculates that the knocker stunned the last beef.

At the time when the knocker stuns the last beef, neither he nor anyone else makes a notation as to the precise time of the stunning. The foreman punches out on the punch card when the last beef leaves the chain. The foreman makes a computation as to when the last beef presumably was stunned by the knocker. Based on chain speed, he calculates the amount of time which presumably elapsed in processing the last beef from the stunning by the knocker to the end of the chain. After he calculates such time, he deducts that calculation from the time he has punched out on the punch card. By this process, he calculates the time when the last beef presumably was stunned by the knocker. The foreman's conclusion as to the time when the last beef was stunned is based solely on the above described calculations and not upon actual observation and notation as to the time of the stunning of the last beef. The difference between the time calculated as the last stunning and the knocker's fixed starting time is computed as knocker time called and applied as gang time to all employees who work on the chain. Since it opened, Schuyler Packing has paid the kill floor employees according to such gang time. The Company has not preserved the calculations of the foreman from which gang time is decided.

14. To assist the Court in understanding gang time computation, generally described above, we present to the Court hypothetical examples: (a) Assume that the knocker reports to his station at 6:30 a. m., his fixed starting time, and that he has punched in on the time clock at 6:25 a. m. He knocks and hangs several beef on the chain. The beef is held for five minutes (lead time) after being stunned before it is shackled and placed on the chain by the shackler whose fixed starting time is 6:35 a. m. At the end of this five-minute lead time, the chain begins to operate, commencing the gang time. Assume further that in twenty-nine minutes, the chain is full and all employees are working at their stations. Assume that as its goal for the day, the Company sets an eight-hour kill. Without down time, it is then anticipated by the Company that if its goal is met, the last beef would be stunned at approximately 3:00 p. m.

Assume that at the end of the day, the knocker stuns the last beef, leaves his work station, walks to the time clock at the end of the chain, and punches his time card out. Assume that the time punched out on his time card is 3:05 p. m. Assume further that, subsequently, the foreman observes the last beef move from the chain into the cooler and that he punches the punch card out at 3:34 p. m. To calculate the knocker's time, gang time, the foreman deducts from 3:34 p. m. five minutes lead time and the twenty-nine minutes which it hypothetically took the beef to move the length of the chain, assuming no down time on the last beef is recorded. His computation indicates that the last beef presumably was stunned by the knocker at 3:00 p. m. Taking the difference between the Company's fixed starting time for the knocker at 6:30 a. m. and the 3:00 p. m. computed time, the foreman arrives at a calculated work time for the knocker of eight and one-half hours. He then deducts one-half hour for lunch. The remaining figure of eight hours is the computed gang time upon which kill floor employees' pay is based. The

knocker's time card shows eight hours and ten minutes, deducting one-half hour for lunch, or eight and one-quarter compensable hours.

(b) Assume that an employee who works on the final trim rail has a fixed starting time of 7:00 a. m. He punches in on the time clock at 6:55 a. m., walks to his position on the trim rail, rakes out his knives and prepares for the first beef which arrives at his work station at 7:00 a. m. Assume further that at the end of the day he completes work on the last beef at 3:32 p. m., walks to the time clock and punches out at 3:48 p. m. The computed gang time for the day is eight hours; his time card shows eight hours, twenty-three minutes, deducting one-half hour for lunch, or eight and one-half compensable hours. On gang time no overtime would have been paid. On clock time this employee would have received one-half hour at time and one-half.

15. All employees other than kill floor employees are paid according to their punched entries on their time cards. Punches on the time cards of kill floor employees are viewed by the Company merely as attendance records, although employees are encouraged not to punch in or report to their station earlier than five minutes prior to the time they are scheduled to begin work. A notice is posted advising employees not to punch in early or punch out late. Records of the Company show that the Company has deducted from the pay of individuals one-quarter hour from gang time for being late to work.

16. Daily time was rounded off to the nearest quarter hour, prior to the present labor agreement now in effect. If the recorded extra minutes amount to seven minutes or less each, the workers were paid nothing for that extra time. If the total extra minutes amount to more than seven minutes, the workers are paid for another quarter hour.

The Company deducts as non-compensable time thirty minutes for lunch.

17. On the effective date of the Union contract, May 5, 1969, the Company agreed to pay time and one-half for all hours worked in excess of eight hours in one day. For work performed on a holiday, the Company is obligated to pay, in addition to holiday pay, time and one-half for hours worked on the holiday. The Company has at all times been required by law to pay time and one-half for hours worked over forty each week.

18. The Company contends that the kill floor foreman generally each day writes his computation of gang time hours on the employee's time card in the space designated for that particular day. This figure usually appears in handwriting in the last column on the time card. See for example, the time cards of Leroy Christensen and Dennis LeGrand for the weeks ending January 3 and 10, 1970, attached hereto as "Exhibit C" and "Exhibit E", respectively.* On Christensen's time card for the week ending January 3, 1970, the foreman has recorded computed time of forty-three and one-half hours for the week, whereas the weekly total of the daily differences between the in and out punches on his time card, less one-half hour for lunch per day, is forty-five hours. The differences between clock time and gang time are accurately shown on the analysis of "Exhibit C" and "Exhibit E" attached hereto as "Exhibit D" and "Exhibit F", respectively.*

19. Also, the foreman intended to note the gang time for each employee on a spread sheet, a copy of which is attached hereto as "Exhibit G".* However, there are instances where such gang time of employees are not recorded on the spread sheets.

20. The superintendent maintains a daily log which is kept in a calendar appointment book. Copies of pages from such logs for calendar years 1969 and 1970 are attached as "Exhibit I" and "Exhibit J".* *Inter alia,* the log usually shows the computed gang time, although this record is not accurate to the minute

---

* Exhibits omitted for purposes of publication.

(no computed gang time for January 2 and 3, 1970 is recorded on "Exhibit J").

21. The time cards are filed at Schuyler and copies of the spread sheets are forwarded to the Spencer, Iowa, corporate headquarters to be key punched into the computer for purposes of print-out payroll checks, payroll ledger and cost register. Payment is made from the spread sheets received in Spencer.

22. In most weeks, if the time on the time cards (punching in through punching out) were added for each employee, this amount would be greater than the time shown on the spread sheet on the basis of which the employees are paid.

23. Notwithstanding the foregoing, there are discrepancies in the records showing that workers who presumably were to have been paid gang time were paid more or less than gang time.

24. Because of their inability to reach agreement on certain factual details, the parties have purposely left ambiguities in this Stipulation of Facts to enable each party to argue its version of those factual details in its brief. However, the parties will supply the Court with such additional information as it shall request.