T.C. Memo. 2009-111

UNITED STATES TAX COURT

WILLIAM D. AND YEN-LING K. ROGERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3477-07.                    Filed May 20, 2009.

        Ps are husband and wife.  In 2002 and 2003 they
were U.S. citizens residing in Taiwan.  R determined
deficiencies in Ps' Federal income tax for 2002 and
2003 on the basis that Ps had claimed excessive
exclusions under sec. 911, I.R.C., for income Mrs.
Rogers earned while working as a flight attendant.

        <u>Held</u>:  Ps claimed excessive exclusions and are
liable for deficiencies.

William D. and Yen-Ling K. Rogers, pro sese.

<u>Emily Giometti</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  This case is before the Court on a petition for redetermination of deficiencies for petitioners' 2002 and 2003 tax years.  The issue for decision is whether petitioners are entitled to exclude under section 911[1] all wage income Mrs. Rogers earned in 2002 and 2003 while working for United Airlines, Inc. (United), as a flight attendant.

FINDINGS OF FACT

During 2002 and 2003 petitioners, who are husband and wife, were U.S. citizens residing in Taiwan.  Mrs. Rogers was employed by United as a flight attendant based at Hong Kong International Airport.  United required Mrs. Rogers to perform preboarding and postarrival services on every flight on which she worked.  Mrs. Rogers was required to check in 1 hour and 45 minutes before the departure of a flight.  And she was required to perform approximately 30 minutes of postarrival services.  United paid Mrs. Rogers for her actual flight time--from when an airplane pushed back from the terminal until it reached its destination. United did not pay Mrs. Rogers extra amounts for preboarding and postarrival services.

---

[1]All section references are to the Internal Revenue Code of 1986, as amended and in effect for the tax years at issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

During 2002 Mrs. Rogers worked on 6 round-trip flights from Hong Kong to San Francisco and 17 round-trip flights from Hong Kong to Chicago.[2]  During 2003 she worked on the following flights:  (1) 8 round-trip flights from Hong Kong to San Francisco; (2) 12 round-trip flights from Hong Kong to Chicago; (3) 6 flights from Hong Kong to Tokyo to San Francisco and then back to Hong Kong via Tokyo; (4) 1 flight from Hong Kong to Tokyo to Chicago and then back to Hong Kong via Tokyo; and (5) 3 flights from Hong Kong to Incheon (Seoul) to Tokyo to Beijing to Tokyo to Seoul to Hong Kong.[3]

---

[2]Each round-trip flight from Hong Kong to San Francisco required Mrs. Rogers to perform approximately 1,575 minutes of in-flight services, excluding any preboarding and postarrival services.  Each round-trip flight from Hong Kong to Chicago required her to perform approximately 1,684 minutes of in-flight services, excluding any preboarding and postarrival services.

[3]Each of the six flights from Hong Kong to Tokyo to San Francisco and then back to Hong Kong via Tokyo required Mrs. Rogers to perform approximately 2,000 minutes of in-flight services, including time spent during each layover in Tokyo, but excluding any other preboarding and postarrival services.  The flight from Hong Kong to Tokyo to Chicago and then back to Hong Kong via Tokyo required Mrs. Rogers to perform approximately 2,257 minutes of in-flight services, including time spent during each layover in Tokyo, but excluding any other preboarding and postarrival services.  Each of the three flights from Hong Kong to Seoul to Tokyo to Beijing to Tokyo to Seoul to Hong Kong required Mrs. Rogers to perform approximately 2,205 minutes of in-flight services, including time spent during each layover in Seoul and Tokyo, but excluding any other preboarding and postarrival services.

United paid Mrs. Rogers $52,296.51 in wages in 2002 and $60,651.89 in wages in 2003. To enable its employees to determine the percentage of wages earned for services rendered in or above a foreign country, United generated and made available on its Web site duty time apportionment forms (DTAs).[4] Petitioners filed Forms 1040, U.S. Individual Income Tax Return, for 2002 and 2003 claiming that all of Mrs. Rogers's wage income was foreign earned income which petitioners could exclude from total income for Federal income tax purposes.[5]

On November 28, 2006, respondent issued petitioners a notice of deficiency for their 2002 and 2003 tax years in which respondent determined respective deficiencies of $5,434 and

---

[4]Petitioners prepared their own DTA allocating Mrs. Rogers's United income for the round-trip flights from Hong Kong to San Francisco, from Hong Kong to Chicago, and from Hong Kong to Tokyo. That DTA allocates percentages significantly higher than those in United's DTAs to time spent over foreign countries--in other words, in a manner more favorable to petitioners. For example, for the round-trip flights from Hong Kong to San Francisco, the four United DTAs in evidence for trips between those cities allocated 20.8 percent (as of "8/27/02") and 14.4 percent (as of "1/31/00", "3/4/05", and "3/31/07") to time spent over foreign countries. Petitioners' DTA allocates 46.97 percent (723 minutes divided by 1539 total flight minutes) of each of those flights to time spent over foreign countries. The big difference is attributable to a factual dispute as to time spent flying over international waters versus time spent flying over foreign countries.

[5]Petitioners reported Mrs. Rogers's wage income but, on line 21 of both Forms 1040 petitioners listed the entire amount of her wages in parentheses and wrote "2555-EZ". Attached to those returns were Forms 2555-EZ, Foreign Earned Income Exclusion.

$8,376.[6] The deficiencies resulted from the disallowance of $20,221 of the claimed exclusion for 2002 and $29,916 of the claimed exclusion for 2003. Respondent's tax compliance officer (TCO), Vivian Kong, computed the deficiency as follows. Using the DTA petitioners prepared, which covered only the round-trip flights from Hong Kong to San Francisco and from Hong Kong to Chicago, TCO Kong calculated the respective percentages of time Mrs. Rogers spent performing in-flight services over foreign territories, U.S. territories, and international waters for each trip.[7] For routes not covered by petitioners' DTA, TCO Kong calculated the necessary percentages using United's DTAs, which were generally less favorable to petitioners. Then, TCO Kong multiplied those percentages by the total amount of Mrs. Rogers's wage income from United for each of the tax years at issue.

Petitioners filed a timely petition with this Court. At the time they filed their petition, petitioners resided in Taiwan. A trial was held on March 18, 2008, in San Francisco, California.

---

[6]The Form 4089, Notice of Deficiency - Waiver, attached to the notice of deficiency incorrectly stated that the asserted deficiency was $6,534 for 2002.

[7]Respondent acknowledges that TCO Kong made a few mistakes. For one thing, she "erroneously did not include time devoted to pre-flight and post-flight services, such as briefing, boarding, and going through customs." TCO Kong also "mistakenly switched the trip time and excludable percentage for the Hong Kong - Chicago trip * * * with the trip time and excludable percentage for the Hong Kong - San Francisco trip".

OPINION

I.   Income Earned in International Airspace[8]

A. Burden of Proof

The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[9]

B. Determination of Taxable Income

Section 61(a) specifies that "Except as otherwise provided", gross income includes "all income from whatever source derived".  Although most countries employ territorial tax systems, the United States employs a worldwide tax system--it taxes its citizens on their income regardless of its geographic source.  See Crow v. Commissioner, 85 T.C. 376, 380 (1985) ("The United States was historically, and continues to be, virtually unique in taxing its citizens, wherever resident, on their worldwide income, solely by reason of their citizenship."); see also Specking v. Commissioner, 117 T.C. 95, 101-102 (2001), affd.

---

[8]The term "international airspace", as we use it in this opinion, means the airspace above the high seas (international waters).

[9]Although sec. 7491(a) may shift the burden of proof to the Commissioner in specified circumstances, petitioners have not established that they have satisfied the prerequisites under sec. 7491(a)(1) and (2) for such a shift.

sub nom. <u>Haessly v. Commissioner</u>, 68 Fed. Appx. 44 (9th Cir. 2003), affd. sub nom. <u>Umbach v. Commissioner</u>, 357 F.3d 1108 (10th Cir. 2003).  However, as is often the case with our tax laws, there are exceptions.  Section 911, which applies to Mrs. Rogers, is an exception to the U.S. worldwide tax system.

Section 911(a) allows a "qualified individual" to exclude from gross income "foreign earned income".[10]  A "qualified individual" is a U.S. citizen whose tax home is in a foreign country if that individual is a bona fide resident of a foreign country for an uninterrupted period that includes an entire taxable year.[11]  Sec. 911(d)(1).  The statute defines "foreign earned income" as "the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual".  Sec. 911(b)(1)(A).

In 2002 and 2003 Mrs. Rogers was a qualified individual who received foreign earned income with respect to which she is entitled to an exclusion.  The question that we are called upon to decide is a matter of degree:  How much of Mrs. Rogers's United wages qualifies as "foreign earned income"?  The answer

---

[10]In 2002 and 2003 the exclusion was limited to $80,000. See sec. 911(b)(2)(D)(i).

[11]A U.S. citizen or resident can also qualify if that individual is present in a foreign country or countries for at least 330 full days during a 12-month period.  Sec. 911(d)(1); sec. 1.911-2(c) and (d), Income Tax Regs.

turns on how much of Mrs. Rogers's income was earned while she worked in a foreign country.

Section 911 does not define "foreign country".  However, one of its implementing regulations, section 1.911-2(h), Income Tax Regs., does:

>     (h) Foreign country.  The term "foreign country" when used in a geographical sense includes any territory under the sovereignty of a government other than that of the United States. It includes the territorial waters of the foreign country (determined in accordance with the laws of the United States), the air space over the foreign country, and the seabed and subsoil of those submarine areas which are adjacent to the territorial waters of the foreign country and over which the foreign country has exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources.[12]

In Clark v. Commissioner, T.C. Memo. 2008-71, we held that international waters are not a "foreign country" and that income earned while traveling in international waters is not "foreign earned income" excludable from gross income under section 911. We can divine no difference between international waters and the airspace above them for purposes of determining whether income earned therein is considered foreign source income. International airspace--like international waters--is not under

---

[12]Sec. 911(d)(9) expressly delegates to the Secretary of the Treasury the authority to prescribe regulations "necessary or appropriate to carry out the purposes" of sec. 911.  The Court of Appeals for the Seventh Circuit has upheld the validity of sec. 1.911-2(h), Income Tax Regs., concluding that the definition therein of "foreign country" is "reasonable" and must be deferred to.  Arnett v. Commissioner, 473 F.3d 790, 797 (7th Cir. 2007), affg. 126 T.C. 89 (2006).

the sovereignty of a Government other than the United States.[13]
See <u>Gantchar v. United Airlines, Inc.</u>, No. 93 C 1457 (N.D. Ill.
Mar. 24, 1995) ("Being outside the United States is not
synonymous with being in a foreign state; international airspace
and international waters are outside the United States without
being inside a foreign state."); see also <u>United States v.
Cabaccang</u>, 332 F.3d 622, 626 (9th Cir. 2003) ("Unlike, for
example, a foreign nation--which is unquestionably a 'place
outside' the United States--international airspace is neither a
point of origin nor a destination of a drug shipment; it is
merely something through which an aircraft must pass on its way
from one location to another.").  It follows that international
airspace is not a "foreign country" for purposes of section 911.

---

[13]Petitioners argue that "linking foreign earned income to
geography fails upon closer scrutiny" because "It would not be
feasible to allocate earnings according to time spent over the
United States, a foreign country, and international waters" for
someone working in outer space.  According to petitioners, "That
person's earnings would all be foreign earned income".  Their
argument is creative, but irrelevant and unpersuasive.  Because
petitioners' case does not concern income earned in outer space,
their argument is irrelevant.  It is unpersuasive because no
state has sovereignty over outer space, so income earned in outer
space would not be considered foreign earned income.  See Treaty
on Principles Governing the Activities of States in the
Exploration and Use of Outer Space, Including the Moon and Other
Celestial Bodies, art. II, Jan. 27, 1967, 18 U.S.T. 2410 ("Outer
space, including the moon and other celestial bodies, is not
subject to national appropriation by claim of sovereignty, by
means of use or occupation, or by any other means.").  For
Federal income tax purposes, income earned in outer space would
be treated just like income earned in international waters or in
international airspace.

As a result, income Mrs. Rogers earned while working in international airspace is not "foreign earned income" and must be included in petitioners' gross income for 2002 and 2003.[14]

Respondent has been more than fair in affording petitioners the benefits of their self-prepared DTA, which is at odds with those prepared by United and which may inflate the amount of time Mrs. Rogers spent over foreign countries. Because all flights in 2002 were round-trip flights from Hong Kong to San Francisco or from Hong Kong to Chicago, we find respondent's adjustments for 2002 to be correct except for a $1 rounding error in respondent's favor on the round-trip flights from Hong Kong to Chicago. We will allow petitioners to exclude $32,077 from their 2002 gross income (rather than the $32,076 respondent allowed). Respondent resorted to United's sample DTAs only for 2003 flights on routes not covered by petitioners' DTA.

On brief respondent asserts that it would be administratively burdensome for the Internal Revenue Service to "calculate the respective percentage of wages earned over foreign countries for each flight separately". Nevertheless, on reply

[14]In any event, even if we agreed with petitioners that income earned in international airspace qualifies for the sec. 911 exclusion, petitioners had no basis for excluding all of Mrs. Rogers's United income for 2002 and 2003. That is because it is clear that Mrs. Rogers earned some portion of her income for those years in the United States. In 2002 all 23 of her round-trip flights landed in and took off from the United States. And in 2003 27 of her 30 round-trip flights landed in and took off from the United States.

brief respondent concedes that nothing prevents an "individual from * * * relying on specific flight plans."

At trial Captain Patrick Palazzolo, a United pilot who flies mainly between Hong Kong and San Francisco, testified credibly that the amount of flight time spent over foreign countries varies depending on weather patterns and the location of the jetstream. For example, a greater portion of a Hong Kong to San Francisco flight is more likely to be over land in the winter than it is in the summer. Thus, if petitioners could prove that Mrs. Rogers flew that route only in the winter, they would be entitled to a higher ratio of time spent over foreign countries for those flights. They have not done so.

For the 2003 routes not covered by their self-prepared DTA, petitioners have not provided evidence that would enable a calculation of actual flight time ratios sufficient to overcome respondent's use of United's DTAs. Without evidence of when she flew (such as flight plans), even with Captain Palazzolo's testimony, we cannot assign flight time ratios in excess of those taken from United's DTAs for the routes on which Mrs. Rogers flew.[15]

---

[15]Captain Palazzolo testified that he does not agree with United's DTAs because they appear to account for flights that are primarily over water but not for those primarily over land. Even if he is correct, we still have no evidence as to when Mrs. Rogers flew, and respondent has already accepted petitioners' DTA which allocates 46.97 percent of Mrs. Rogers's round-trip flights

(continued...)

During 2003 in addition to the round-trip flights from Hong Kong to San Francisco and from Hong Kong to Chicago, Mrs. Rogers flew on (1) six flights from Hong Kong to Tokyo to San Francisco and then back to Hong Kong via Tokyo; (2) one flight from Hong Kong to Tokyo to Chicago and then back to Hong Kong via Tokyo; and (3) three flights from Hong Kong to Seoul to Tokyo to Beijing to Tokyo to Seoul to Hong Kong. Captain Palazzolo did not testify specifically regarding the six flights from Hong Kong to Tokyo to San Francisco and then back to Hong Kong via Tokyo or the flight from Hong Kong to Tokyo to Chicago and then back to Hong Kong via Tokyo.

He did testify regarding the three flights from Hong Kong to Seoul to Tokyo to Beijing to Tokyo to Seoul to Hong Kong.[16] He indicated that the jetstream and winds played little part in these trips and that the flight time would have been "essentially the same in both directions." He testified that a flight from

---

[15](...continued)
from Hong Kong to San Francisco to time spent over foreign countries. That is significantly higher than the 20.8 percent and 14.4 percent allocated in United's DTAs to time spent over foreign countries for round-trip flights from Hong Kong to San Francisco. See supra note 4.

[16]Although the parties stipulated that the flights were from Hong Kong to Seoul to Tokyo to Beijing to Tokyo to Seoul to Hong Kong, it appears from Captain Palazzolo's and Mrs. Rogers's testimony and United's sample DTAs that the actual route might have been from Hong Kong to Tokyo to Seoul to Beijing to Seoul to Tokyo to Hong Kong. In other words, it appears that the parties mixed up the order of Tokyo and Seoul on those three flights.

Hong Kong to Tokyo takes about 3 to 3-1/2 hours and that the time spent over foreign territory would be 90 to 95 minutes. He also testified that a flight from Tokyo to Seoul would be almost all over foreign territory (except for a few minutes over the Sea of Japan) and that a flight from Seoul to Beijing would be mostly over foreign territory (except for a few minutes over the Yellow Sea). Respondent has determined that 74.77 percent of Mrs. Rogers's work on the three flights from Hong Kong to Seoul to Tokyo to Beijing to Tokyo to Seoul to Hong Kong is allocable to services rendered over foreign territory. Although we are unable to reconcile respondent's calculation and United's sample DTAs, the amounts are very close and are not materially inconsistent with Captain Palazzolo's testimony.[17]

Given respondent's adoption of petitioners' DTAs with respect to the round-trip flights from Hong Kong to San Francisco and from Hong Kong to Chicago, it is possible that petitioners are entitled to a larger foreign territory exclusion with respect to the six flights from Hong Kong to Tokyo to San Francisco and then back to Hong Kong via Tokyo and the one flight from Hong

---

[17]United's sample DTAs do not include information on round-trip flights from Hong Kong to Seoul, perhaps because United did not fly that route. See supra note 16. In any event, given that the exclusion that respondent has allowed for those three flights is not materially inconsistent with Captain Palazzolo's testimony, our conclusion is the same regardless of whether the stipulation as to those three flights is accurate or whether the trial testimony is in fact correct.

Kong to Tokyo to Chicago and then back to Hong Kong via Tokyo. However, the evidence of record is not sufficient or detailed enough to permit such a finding. Critically missing is information regarding the time spent over international waters during the flights from either San Francisco or Chicago to Tokyo. Those flights, unlike the direct U.S. to Hong Kong flights, are unlikely to cross any Chinese territory and may cross less or no Russian territory given Tokyo's location considerably east-northeast of Hong Kong. This may be especially true during winter months, when more of the flights are over land. Therefore, we shall sustain respondent's calculations of the percentages of those flights spent over foreign territory after correcting certain mathematical errors.[18]

---

[18]In the Form 886-A, Explanation of Adjustments, attached to the notice of deficiency, respondent determined the following exclusion amounts for petitioners' 2003 tax year: (1) $9,686 for the round-trip flights from Hong Kong to Chicago; (2) $9,603 for the round-trip flights from Hong Kong to San Francisco; (3) $4,549 for the flights from Hong Kong to Tokyo to San Francisco and then back to Hong Kong via Tokyo; (4) $1,456 for the one flight from Hong Kong to Tokyo to Chicago and then back to Hong Kong via Tokyo; and (5) $5,442 for the three flights from Hong Kong to Seoul to Tokyo to Beijing to Tokyo to Seoul to Hong Kong. Using respondent's numbers, the correct exclusion amounts for those flights are $9,563, $9,798, $4,594, $1,360, and $5,443, respectively. In calculating the exclusion amounts for the 2003 flights using United's sample DTA's, TCO Kong appears to have used at most two decimal places. The net result is a reduced exclusion which we will not countenance. We will allow petitioners an exclusion of $30,768 under sec. 911 for their 2003 tax year instead of the $30,736 exclusion respondent allowed.

Finally, we agree with respondent that petitioners are required to include required preflight and postflight service time when calculating foreign earned income[19] and to allocate income from sick and vacation leave between foreign earned income and income that does not qualify for the section 911 exclusion-- in other words, income subject to Federal income tax.

## II. Interest Abatement

When there has been an unreasonable error or delay with respect to a managerial or ministerial act, the Secretary has discretion to abate interest. Sec. 6404(e). We have jurisdiction under section 6404(h) to determine whether the Secretary's decision not to abate interest was an abuse of discretion.

Petitioners argue that they should not be held liable for any interest on their Federal income tax underpayments because the Internal Revenue Service "changed its interpretation of the law in 2002 but failed to provide clear guidance as [to] the exact methodology that must be used in the allocation of wages

---

[19]Although as a technical matter Mrs. Rogers was paid on the basis of her actual flight time, she did not perform pre- and post-flight services for her own benefit--she did so for United's benefit and at United's direction. Those services must therefore be accounted for in determining petitioners' exclusion amounts for 2002 and 2003. See Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944) (concluding in a Fair Labor Standards Act case that the words "work" and "employment" mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business").

for flight crews". Respondent counters that we lack jurisdiction over petitioners' interest abatement request because respondent has not made a final determination not to abate interest.

In January 2008 petitioners filed a Form 843, Claim for Refund and Request for Abatement, despite the fact that respondent had advised them to wait until interest had been assessed or their abatement request would be rejected as premature. We lack jurisdiction to consider petitioners' interest abatement request for the same reason that respondent advised them not to file such a request--abatement of interest is premature because interest has not been assessed and because respondent has not made a final determination not to abate interest. See Muir v. Commissioner, T.C. Memo. 2000-304 ("Consideration of petitioner's request for abatement of interest is premature, however, as there has been neither an assessment of interest nor a final determination by respondent not to abate the interest."), affd. 11 Fed. Appx. 701 (8th Cir. 2001).

The Court has considered all of petitioners' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered under Rule 155.